Josiah HAYNESWORTH and Fred
Hancock, Appellants,

v.

Frank P. MILLER, Chief, Law Enforce-
ment Section, Office of the Corporation
Counsel, et al., Appellees. (Two Cases)

Nos. 79–1244, 80–1383.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 31, 1981.

Decided May 29, 1987.

Edward L. Genn, with whom J. Stuart Lemle, Washington, D.C., was on the brief, for appellants.

David P. Sutton, Asst. Corp. Counsel, with whom Judith W. Rogers, Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, and Martin L. Grossman, Asst. Corp. Counsel, Washington, D.C., were on the brief, for appellees, District of Columbia, et al. Leo N. Gorman, Asst. Corp. Counsel, Washington, D.C., also entered an appearance for appellees District of Columbia, et al.

L. Mark Winston, with whom Stuart L. Bindeman, Washington, D.C., was on the brief, for appellee Gildon.

Before ROBINSON, Circuit Judge, WRIGHT, Senior Circuit Judge, and VAN PELT,[*] Senior District Judge.

Opinion for the Court filed by Circuit Judge ROBINSON.

Concurring Opinion filed by Senior District Judge VAN PELT.

ROBINSON, Spottswood W., III, Circuit Judge:

■ Josiah Haynesworth and Fred Hancock brought this *Bivens* action[1] for alleged violations of their First, Fourth and Fifth Amendment rights by the District of Columbia and several of its officials.[2] Appellants aver that they were victimized by a policy of retaliatory prosecution—a practice of pursuing criminal charges against individuals who have endured wrongful arrests, solely because they refuse to waive civil suits against the arresting officers.[3]

On appeal, Haynesworth disputes the propriety of the District Court's dismissal under Federal Civil Rule 12(b)(6)[4] of his claims against the District and three individual defendants, and the court's judgment on the pleadings[5] in favor of another. Hancock challenges the District Court's dismissal of his action in toto on the ground of improper joinder of plaintiffs.[6] We find that the order contested by Hancock is not now properly before this court, and accordingly we dismiss his appeal.[7] We do, however, perceive merit in Haynesworth's challenge. We therefore reverse and remand his case for further proceedings against all defendants named in his complaint[8] except one who took office only

---

[*] Of the United States District Court for the District of Nebraska, sitting by designation pursuant to 28 U.S.C. § 294(d) (1982).

1. See *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). At the commencement of this litigation in November, 1978, the statutory cause of action conferred by 42 U.S.C. § 1983 (1982) for deprivations of civil rights did not provide redress for acts committed under color of District of Columbia law. *District of Columbia v. Carter,* 409 U.S. 418, 432, 93 S.Ct. 602, 610, 34 L.Ed.2d 613, 625 (1973). Congress subsequently amended § 1983 to encompass wrongs committed by District actors. Pub.L. No. 96-170, §§ 1, 3, 93 Stat. 1284 (1979). We have recognized that the amendment applies only prospectively, however, and it therefore is not a predicate for relief in this case. *Tarpley v. Greene,* 221 U.S.App.D.C. 227, 231 n. 11, 684 F.2d 1, 5 n. 11 (1982). Since appellants cannot avail themselves of the statutory remedy, we have no occasion to consider whether victims of constitutional violations by the District or its employees after the effective date of the amendment could invoke *Bivens* in lieu of or in addition to a proceeding under § 1983.

 While Haynesworth and Hancock assert a cause of action based directly on the Constitution, their claims are of such nature that they more typically would be pursued under § 1983. In these circumstances, we think the implied constitutional right to sue should mirror the express statutory cause of action to the fullest extent possible. See *Brown v. United States,* 239 U.S.App.D.C. 345, 347 n. 2, 742 F.2d 1498, 1500 n. 2 (*en banc* 1984), *cert. denied,* 471 U.S. 1073, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985) (case for assimilation of § 1983 and *Bivens* caselaw "is especially strong" in constitutional tort actions against District of Columbia); see also *Ellis v. Blum,* 643 F.2d 68, 84 (2d Cir.1981) (noting "the general trend in the appellate courts to incorporate § 1983 law into *Bivens* suits"). Since optimally the remedies should be congruent in both the specifics of their operation and the relief they afford, this opinion frequently relies on caselaw developed in the § 1983 context.

 Appellants also invoke the District Court's pendent jurisdiction to allow consideration of their claims of false arrest, assault and battery, and malicious prosecution. Complaint ¶ 1, *Haynesworth v. Miller,* Civ. No. 78-2223 (D.D.C.) (filed Nov. 27, 1978), Appendix for Appellants (A.App.) 9. We do not address these nonfederal counts at this stage, primarily because their status is entirely dependent upon survival of the constitutional claims. *UMW v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218, 228 (1966) ("[c]ertainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well").

2. Complaint, *supra* note 1, ¶¶ 4-8, A.App. 10-11.

3. *Id.* ¶¶ 12-17, 25-33, A.App. 7-8, 16-18.

4. Fed.R.Civ.P. 12(b)(6).

5. See Fed.R.Civ.P. 12(c).

6. Haynesworth and Hancock appealed separately from the District Court's rulings. We ordered the appeals consolidated for consideration.

7. See Part II *infra.*

8. We make no ruling regarding the claims against Police Officer Sonya Proctor and Prosecutor Howard B. Horowitz, both named as defendants only in Hancock's complaint. We note, however, that Horowitz's alleged miscon-

as the events at issue here were drawing to a close,[9] and another whose conduct is absolutely immune from suit.[10]

## I. BACKGROUND

### A. *Factual Background*

Briefly summarized, the allegations of the complaint are as follows.[11]

#### 1. *Hancock*

One morning in November, 1977, Hancock parked his car on the street in front of his home and proceeded to check the antifreeze.[12] He left the car briefly to fetch a tool, then returned to find appellee Sonya Proctor, an officer of the Metropolitan Police Department, who approached him, requested his driver's license and vehicle registration, and announced that he would be cited for leaving the vehicle unattended with the motor running.[13] As Proctor was handing the citation to Hancock through the car window she dropped it in the street, then demanded, in "a loud, angry voice,"[14] that appellant retrieve it. The ticket had by then blown away, and Hancock refused to chase it.[15] Proctor repeated her order, stepping back from the car and unbuttoning the holster of her gun;[16] when Hancock again declined she ordered him out of the car, patted him down, and placed him under arrest.[17] Hancock was taken to a police station and charged with leaving a motor-running vehicle unattended, depositing trash—the citation—in the street, and disorderly conduct.[18] He forfeited collateral on the first charge but stated that he wished to stand trial on the latter two.[19]

Three days after the incident, Hancock and his wife filed with the Metropolitan Police Department a citizens' complaint against Proctor. A week later, Hancock was formally charged with depositing

---

duct would, by the process of reasoning set forth in Part III(B)(3)(c) *infra,* fall clearly within the ambit of absolute immunity.

**9.** We conclude that, as to this defendant, the complaint fails to state a claim for which relief can be granted. See Part III(B)(2) *infra.*

**10.** See Part III(B)(3)(c) *infra.*

**11.** Only one of the appellees, Police Supervisor Dixie Gildon, filed an answer to the complaint; the others prevailed on a motion to dismiss for failure to state a claim. See Fed.R.Civ.P. 12(b)(6). It is well established that in evaluating the propriety of such a dismissal, we must accept as true the allegations of the complaint, see, e.g., *Square D Co. v. Niagara Frontier Tariff Bureau,* — U.S. —, —, 106 S.Ct. 1922, 1924, 90 L.Ed.2d 413, 418 (1986); *Hughes v. Rowe,* 449 U.S. 5, 10, 101 S.Ct. 173, 176, 66 L.Ed.2d 163, 170–171 (1980); *Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263, 268 (1972) (per curiam), together with all reasonable inferences that may be drawn therefrom in the plaintiff's favor, see, e.g., *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90, 96 (1974); *Carter v. Carlson,* 144 U.S.App.D.C. 388, 390, 447 F.2d 358, 360 (1971), *rev'd on other grounds sub nom. District of Columbia v. Carter,* 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973).

Appellee Gildon did not join in the motion to dismiss, but subsequently prevailed on her post-answer motion for judgment on the pleadings. See Fed.R.Civ.P. 12(c). Rule 12(c) requires that the movant show, at the close of the pleadings, that no material issue of fact remains to be solved, and that he or she is clearly entitled to judgment as a matter of law. *Wager v. Pro,* 188 U.S.App.D.C. 1, 3, 575 F.2d 882, 884 (1976); *Greenberg v. General Mills Fun Group, Inc.,* 478 F.2d 254, 256 (5th Cir.1973); *Southern O. Bank v. Merrill Lynch, Pierce, Fenner & Smith Inc.,* 479 F.2d 478, 480 (6th Cir.1973). The court evaluating the 12(c) motion will accept as true the allegations in the opponent's pleadings, and as false all controverted assertions of the movant, *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 61 (2d Cir.1985); *Gumer v. Shearson, Hammill & Co.,* 516 F.2d 283, 286 (2d Cir.1974); *Cash v. Commissioner,* 580 F.2d 152, 154 (5th Cir.1978), and will accord the benefit of all reasonable inferences to the non-moving party, *Wager v. Pro, supra,* 188 U.S.App.D.C. at 3, 575 F.2d at 884; *NLRB v. Weirton Steel Co.,* 146 F.2d 144, 145 (3d Cir.1944); *Quality Mercury, Inc. v. Ford Motor Co.,* 542 F.2d 466, 468 (8th Cir.1976), *cert. denied,* 433 U.S. 914, 97 S.Ct. 2986, 53 L.Ed.2d 1100 (1977).

**12.** Complaint, *supra* note 1, ¶ 9, A.App. 11–12.

**13.** *Id.,* A.App. 11–12.

**14.** *Id.,* A.App. 11–12.

**15.** *Id.* ¶ 10, A.App. 12.

**16.** *Id.,* A.App. 12.

**17.** *Id.* ¶ 11, A.App. 12.

**18.** *Id.,* A.App. 12.

**19.** *Id.,* A.App. 12.

trash.[20] At a pretrial conference on the trash charge, appellee Howard B. Horowitz, an Assistant Corporation Counsel assigned to the Law Enforcement Section of the District of Columbia Corporation Counsel's Office, told Hancock and his attorney that the pending citizens' complaint presented a "problem."[21] Horowitz stated that he needed to speak to Proctor before he could decide whether to prosecute the trash charge.[22] A few days later, Horowitz informed Hancock's attorney that Proctor was angry about the citizens' complaint, and that the charge would not be dismissed.[23] Hancock then learned that the Police Department was investigating his complaint,[24] and shortly thereafter the charge of disorderly conduct, which had not been pressed after the arrest, was added to the trash charge.[25]

Hancock alleges that the trash charge would have been dropped, and the disorderly conduct charge would never have been reinstated, were it not for the lodging of his citizens' complaint.[26] He asserts that Horowitz pressed this retaliatory prosecution "pursuant to policies and/or directives of [appellee Frank] Miller who was then and is Chief of the Law Enforcement Section of the Corporation Counsel."[27] Hancock's "further demands to supervisory officials and threats of suit for declaratory or injunctive relief"[28] resulted eventually in dismissal of all charges against him.[29]

### 2. Haynesworth

In December 1977, Haynesworth, an employee of the District of Columbia Superior Court, was accosted in a courthouse corridor by three men, who were not known to him, dressed in street attire. One, without any explanation, seized Haynesworth and slammed him against a wall.[30] When Haynesworth endeavored to protect himself and identify his assailant, the latter punched him in the jaw.[31] While the other two men pinned Haynesworth against the wall, the aggressor frisked him and removed his identification badge and pocket calculator.[32]

This episode was interrupted by a courthouse guard, who approached the group, identified Haynesworth as a court employee, and demanded to know what the other three were doing.[33] The assailants, Joseph Schwartz, Donald Lyddane, and Patrick Mooney, for the first time identified themselves as police officers.[34] One instructed the guard to arrest Haynesworth, but the guard demurred, saying that Haynesworth had done nothing to justify an arrest.[35] Haynesworth, seeing that a crowd had gathered, suggested that the three officers accompany him to an adjacent room.[36] There Schwartz, the aggressor in the corridor, grabbed Haynesworth while either Mooney or Lyddane administered a chokehold, restricting Haynesworth's breathing.[37] Haynesworth was struck with a blackjack and handcuffed,[38] then taken to

20. *Id.* ¶¶ 12–13, A.App. 13.

21. *Id.* ¶ 14, A.App. 13.

22. *Id.*, A.App. 13.

23. *Id.*, A.App. 13.

24. *Id.* ¶ 15, A.App. 13.

25. *Id.* ¶ 16, A.App. 13.

26. *Id.* ¶ 17, A.App. 13–14. Hancock additionally contends that the arrest itself was illegal for lack of probable cause. See *id.* ¶ 40, A.App. 20. This allegation forms the basis for his constitutional and common law claims sounding in false arrest, assault and battery, and malicious prosecution. *Id.*, A.App. 20.

27. *Id.* ¶ 17, A.App. 13–14.

28. *Id.* ¶ 35, A.App. 9.

29. *Id.*, A.App. 19.

30. *Id.* ¶ 20, A.App. 14.

31. *Id.*, A.App. 14.

32. *Id.* ¶¶ 20–21, A.App. 14–15.

33. *Id.* ¶ 22, A.App. 15.

34. *Id.*, A.App. 15.

35. *Id.*, A.App. 15.

36. *Id.* ¶ 23, A.App. 15–16.

37. *Id.*, A.App. 15–16.

38. *Id.*, A.App. 15–16.

police headquarters, where he was charged with disorderly conduct.[39]

Processing of the charge against Haynesworth was assigned to appellee Miller, Chief of the Law Enforcement Section of the Corporation Counsel's office. After first talking privately with Schwartz, Lyddane, and appellee Dixie Gildon, their supervisor, Miller held a conference with the officers, Haynesworth and his attorney.[40] Miller stated that he might dismiss the charge under certain conditions, and asked Haynesworth whether he intended to file a civil suit. Haynesworth's counsel objected, stating that this question should be addressed only to him.[41] Miller then asked everyone but the attorney to leave the room. On her way out, Officer Gildon remarked that Haynesworth's initiation of civil proceedings would change their decision to drop the charge; Miller interjected that he, not the police, would make that decision.[42] When the others had departed, Miller told Haynesworth's attorney that the Corporation Counsel's office would pursue the disorderly conduct charge only if Haynesworth threatened civil action against the officers.[43] The attorney responded that he had no authority to waive Haynesworth's right to sue. Miller summoned the others back into the room and announced that Haynesworth would be prosecuted for disorderly conduct.[44]

Haynesworth retained another attorney and, during subsequent discussion of the case, Miller admitted to the attorney that he had previously broached the subject of a release of civil claims.[45] On the day set for trial, Haynesworth and his new counsel met Schwartz, Lyddane, and Mooney on their way to Miller's office for another conference on the case, and Schwartz stated that potential civil litigation was an obstacle to dismissal of the charge.[46] At the conference, Miller, without any reference to waiver, reiterated his intention to press the disorderly conduct charge.[47]

The charge against Haynesworth, like those against Hancock, was ultimately dismissed, "but only after further demands to supervisory officials and the threat of a suit."[48] Haynesworth alleges that the charge would have been dropped at the outset but for the tacit policy of retaliation that prevailed in the Corporation Counsel's office and the Metropolitan Police Department.[49]

## B. *Proceedings in the District Court*

Appellants filed suit in the District Court in November, 1978, seeking compensatory and punitive damages, declaratory relief, and expungement of all records relating to the arrests and prosecutions.[50] Shortly thereafter, the District Court, *sua sponte*, dismissed Hancock from the suit without prejudice,[51] on the ground that his "separate cause of action is improperly joined in this lawsuit."[52] Subsequent attempts to have this order set aside were unsuccessful.[53]

39. *Id.* ¶ 24, A.App. 16.

40. *Id.* ¶ 26, A.App. 16.

41. *Id.,* A.App. 16.

42. *Id.,* A.App. 16.

43. *Id.* ¶ 27, A.App. 17.

44. *Id.,* A.App. 17.

45. *Id.* ¶ 29, A.App. 17.

46. *Id.* ¶¶ 30–31, A.App. 17.

47. *Id.* ¶ 32, A.App. 18.

48. *Id.* ¶ 35, A.App. 19.

49. *Id.* ¶¶ 33–34, A.App. 18. Haynesworth avers additionally that he was arrested and prosecuted without probable cause. See *id.* ¶¶ 41–42, A.App. 21.

50. Complaint, *supra* note 1, at 16–17 (prayer for relief), A.App. 23–24.

51. *Haynesworth v. Miller,* Civ. No. 78–2223 (D.D.C. Dec. 5, 1978) (order), A.App. 25.

52. *Id.,* A.App. 25.

53. Hancock presented a "Motion to Set Aside Order of Dismissal," A.App. 26–31, which was denied, *Haynesworth v. Miller,* Civ. No. 78–2223 (D.D.C. Dec. 26, 1978) (order), A.App. 32–34. Undaunted, he then submitted a "Motion to Set Aside Order Denying Motion to Set Aside," A.App. 35–38, which was also denied, apparently during the course of a status hearing, see Joint Brief for Appellants at 5.

Officer Gildon answered in due course, denying that Officers Schwartz, Lyddane, and Mooney[54] had accosted Haynesworth, and denying that she and these officers had engaged in retaliatory prosecution, but admitting that she had remarked that the decision to drop the disorderly conduct charge would be affected by Haynesworth's decision to file suit.[55] Gildon moved for partial judgment on the pleadings and the District Court, discerning no indication that Gildon had "participated in the complained of arrest or prosecution," dismissed her from the action.[56]

Miller, the District of Columbia, and former Police Chiefs Burtell Jefferson and Maurice Cullinane, in lieu of responsive pleadings, jointly filed a motion to dismiss. Miller asserted that he and the District of Columbia, as his employer, were absolutely shielded from liability by the doctrine of prosecutorial immunity.[57] The District contended additionally that it was not accountable on the theory of respondeat superior for the constitutional torts of its employees.[58] Appellees Jefferson and Cullinane similarly disclaimed vicarious liability for the torts of their subordinates, and pointed out that the complaint did not aver that they participated directly in the activities complained of.[59] The District Court granted the motion and dismissed Miller, Jefferson, Cullinane, and the District of Columbia essentially for the reasons tendered.[60]

## II. REVIEWABILITY

 Federal Civil Rule 54(b)[61] imposes a restraint on appeals from orders partially disposing of suits involving multiple claims or parties. The rule also furnishes, however, a mechanism allowing such appeals to go forward. The rule provides that a district-court ruling disposing of some but not all of the claims or liabilities in an action is appealable only after the court expressly determines that the appeal should not be delayed and expressly directs the entry of judgment.[62] Rule 54(b) thus embodies a

---

**54.** Officers Schwartz, Lyddane and Mooney also filed answers but did not seek dismissal. The claims against these three defendants are all that remain before the District Court. Further proceedings against the officers were stayed pending disposition of this appeal. See Rule 54(b) Certificate and Order, *Haynesworth v. Miller,* Civ. No. 78–2223 (D.D.C.) (filed Mar. 21, 1980), A.App. 59–60.

**55.** See Answer of Dixie Gildon ¶ 26, *Haynesworth v. Miller,* Civ. No. 78–2223 (D.D.C.) (filed Feb. 7, 1979), Appendix to Brief for Appellee Gildon (Gildon App.) 2. While Gildon admitted that she made the remark, she also averred that she wanted Haynesworth prosecuted on the disorderly conduct charge regardless of whether he planned to file civil suit. *Id.* ¶ 33, Gildon App. 3.

**56.** *Haynesworth v. Miller,* Civ. No. 78–2223 (D.D.C. Oct. 31, 1979) (order), A.App. 58.

**57.** Motion of Defendants Frank P. Miller, District of Columbia, Burtell M. Jefferson and Maurice Cullinane to Dismiss the Complaint ¶ 2, *Haynesworth v. Miller,* Civ. No. 78–2223 (D.D.C.) (filed Feb. 15, 1979), A.App. 41. Because of the severance and dismissal of Hancock's claims, neither Assistant Corporation Counsel Horowitz nor Officer Proctor, named as defendants only by Hancock, filed answers to the complaint.

**58.** *Id.* ¶ 3, A.App. 41.

**59.** *Id.* ¶ 4, A.App. 42.

**60.** See *Haynesworth v. Miller,* Civ. No. 78–2223 (D.D.C. June 22, 1979) (order and memorandum opinion), A.App. 47–55 [hereinafter cited as *Memorandum Opinion* ].

**61.** Fed.R.Civ.P. 54(b) states:

When more than one claim for relief is presented in an action ... or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all of the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

See generally 10 C. Wright, A. Miller & M. Kane, Federal Practice §§ 2653–2661 (1983 & Supp. 1986); 6 J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice ¶ 54.04 (1985 & Supp. 1985–1986).

**62.** See *Curtiss-Wright Corp. v. General Elec. Co.,* 446 U.S. 1, 7–8, 100 S.Ct. 1460, 1464–1465, 64 L.Ed.2d 1, 11 (1980); 10 C. Wright, A. Miller & M. Kane, *supra* note 61, § 2655.

reconciliation of the policy disfavoring piecemeal appeals from interlocutory orders with that of avoiding needless delay when final action has been taken in a truly severable portion of a multiclaim or multiparty case.[63] Mere satisfaction of Rule 54(b)'s requirements will not impart appealability to an order that otherwise is not really final,[64] but without the steps called for by the rule an order remains interlocutory even if it fully disposes of a discrete portion of the litigation.[65]

■ The District Court adhered fully to the dictates of Rule 54(b) after issuance of the orders dismissing all claims against Miller, Jefferson, Cullinane, and the District of Columbia, and after granting Gildon's motion for judgment on the pleadings.[66] Consequently, these orders are properly before us on this appeal. But nothing in the record reveals any effort by the District Court with respect to the *sua sponte* order severing and dismissing Hancock's claims to meet the demands of Rule 54(b).[67] Failure to take the steps specified

in Rule 54(b) is more than a mere technicality; without compliance, a federal court of appeals lacks jurisdiction to entertain challenges to the order.[68] We thus have no choice but to dismiss Hancock's appeal.

This ruling, of course, does not preclude Hancock from pressing his case. The District Court's order remains interlocutory and is subject to revision until the balance of the claims have been adjudicated.[69] If the District Court does not vacate its *sua sponte* dismissal of Hancock's action when the proceedings resume, the order will become final and appealable upon completion of the litigation in that court. Moreover, Hancock, of course, is always at liberty to seek compliance with Rule 54(b) with a view toward resurrecting his appeal. But it may well be that judicial economy would be better served if the District Court first reevaluated its order in light of appellees' concession that the proper remedy for misjoinder of Hancock's claims, assuming without deciding that such misjoinder actu-

**63.** 10 C. Wright, A. Miller & M. Kane, *supra* note 61, § 2654. Such a balancing has been compelled by the modern rules promoting the joinder of claims and parties. As the Seventh Circuit has explained,

joinder can create "hardship and denial of justice through delay if each issue must await the determination of all issues as to all parties before a final judgment can be had." ... Rule 54(b) allows an aggrieved party to obtain review that will accelerate the resolution of one question without disrupting the rest of the litigation....

*Exchange Nat'l Bank v. Daniels*, 763 F.2d 286, 290–291 (7th Cir.) (quoting *Dickinson v. Petroleum Conversion Corp.*, 338 U.S. 507, 511, 70 S.Ct. 322, 324, 94 L.Ed. 299, 302 (1950)), *reh'g granted in part on other grounds*, 768 F.2d 140 (7th Cir.1985).

**64.** *Gold Seal Co. v. Weeks*, 93 U.S.App.D.C. 249, 258, 209 F.2d 802, 811 (1954); *Page v. Preisser*, 585 F.2d 336, 338–339 (8th Cir.1978); 10 C. Wright, A. Miller & M. Kane, *supra* note 61, § 2655, at 41.

**65.** 10 C. Wright, A. Miller & M. Kane, *supra* note 61, § 2654, at 38; see text at note 68 *infra*.

**66.** See Rule 54(b) Certificate and Order, *Haynesworth v. Miller*, Civ. No. 78–2223 (D.D.C.) (filed Mar. 21, 1980), A.App. 59.

**67.** See text *supra* at note 52. Nonobservance of Rule 54(b) and the problem created thereby

were noted by the Chief Staff Counsel of this court in a letter to Hancock's attorney dated March 14, 1979, but the letter did not incite curative action. There is some indication that counsel believed it sufficient for purposes of compliance with Rule 54(b) to satisfy its prerequisites for the appeal brought by Haynesworth and then consolidate it with Hancock's. See Motion to Stay Proceedings or for Other Relief, *Hancock v. Miller*, No. 79–1244 (D.C.Cir.) (filed Apr. 26, 1979); Motion for Order Extending the Time for Stay of Proceeding, *Hancock v. Miller*, No. 79–1244 (D.C.Cir.) (filed Aug. 6, 1979). That was clearly a misconception, because the two appeals involve different orders, which individually must meet the requirements of Rule 54(b).

**68.** See *Kappelmann v. Delta Air Lines*, 176 U.S. App.D.C. 163, 166, 539 F.2d 165, 168 (1976), *cert. denied*, 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 776 (1977); *Turtle v. Institute for Resource Management, Inc.*, 154 U.S.App.D.C. 341, 342, 475 F.2d 925, 926 (1973); 10 C. Wright, A. Miller & M. Kane, *supra* note 61, § 2660.

**69.** It must be remembered that claims asserted in the Haynesworth-Hancock complaint against three of the defendants remain unadjudicated in the District Court. See note 54 *supra*; Fed.R. Civ.P. 54(b) (quoted *supra* note 61); *Reuber v. United States*, 249 U.S.App.D.C. 161, 162, 773 F.2d 1367, 1368 (1985); 10 C. Wright, A. Miller & M. Kane, *supra* note 61, § 2660.

ally occurred, would be severance and not dismissal of Hancock's complaint.[70]

### III. HAYNESWORTH'S COMPLAINT

■ Haynesworth's case thus reaches us on the motions to dismiss and for judgment on the pleadings. Motions such as these, that would summarily extinguish litigation at the threshold and foreclose the opportunity for discovery and factual presentation, should be treated with the greatest of care. A motion to dismiss should be granted only when it appears beyond doubt that, under any reasonable reading of the complaint, the plaintiff will be unable to prove any set of facts that would justify relief.[71] The standard for awarding judgment on the pleadings is virtually identical: regardless of assertions in an answer, a defendant may not succeed on such a motion if there are allegations in the complaint which, if proved, would provide a basis for recovery.[72] A plaintiff's bare conclusions of law, or sweeping and unwarranted averments of fact, will not be deemed admitted for purposes of either type of motion;[73] but the plaintiff enjoys the benefit of all inferences that plausibly can be drawn from well-pleaded allegations of the complaint.[74]

Several issues are thus framed for our consideration. The threshold question we must address in assaying the propriety of the District Court's rulings is whether Haynesworth alleged any conduct for which a cause of action for damages may be implied directly from the Constitution. If so, we must then determine the extent to which each appellee may have been implicated in the constitutional wrong depicted, and whether his or her participation may have been sufficient to warrant liability.

---

**70.** Brief for Appellees Jefferson, Cullinane, Miller and the District of Columbia at 7 n. 1. See Fed.R.Civ.P. 21. Appellees urge us to treat the District Court's order as having effected only a severance and not a dismissal of Hancock's claims, but that construction would not comport with the plain language of the order.

**71.** *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2233, 81 L.Ed.2d 59, 65 (1984); *McLain v. Real Estate Bd.,* 444 U.S. 232, 246, 100 S.Ct. 502, 511, 62 L.Ed.2d 441, 453 (1980); *Haines v. Kerner,* 404 U.S. 519, 521, 92 S.Ct. 594, 596, 30 L.Ed.2d 652, 654 (1972). It should be noted, however, that in suits against governmental officials, immunity doctrines may have an influence on traditional pleading rules. For instance, a complaint setting forth an otherwise colorable claim will be dismissed if the alleged wrongdoer enjoys absolute immunity for the act in question. See Part III(B)(3)(c) *infra.* The impact of qualified immunity on a complaint against a governmental actor is far less clear. While qualified immunity is generally resolved on a motion for summary judgment, see note 159 *infra,* this court has recognized that in certain circumstances the spectre of a qualified immunity defense will place special burdens on the complaint at the pleading stage. For example, in *Hobson v. Wilson,* 237 U.S.App.D.C. 219, 737 F.2d 1 (1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985), we held that the principles underlying qualified immunity required that pleading rules historically liberal be constricted in cases where a complaint asserts that a governmental actor possesses a clearly unconstitutional motive, *id.* at 248, 737 F.2d at 30; in such cases, the complaint must set forth "specific facts to support a claim of unconstitutional motive," and may not survive on mere conclusory allegations of malice. *Id.;*

see also *Martin v. D.C. Metro. Police Dep't,* 259 U.S.App.D.C. 31, 39, 812 F.2d 1425, 1433 (1987), *vacated in part,* 817 F.2d 144 (order) (D.C.Cir. 1987); cf. *Smith v. Nixon,* 257 U.S.App. D.C. 52, 55, 807 F.2d 197, 200 (1987) (applying *Hobson* in national security context).

**72.** See *Bloor v. Carro, Spanback, Londin, Rodman & Fass, supra* note 11, 754 F.2d at 61; *Wager v. Pro, supra* note 11, 188 U.S.App.D.C. at 3, 575 F.2d at 884; *Holmes v. Curtis Publishing Co.,* 303 F.Supp. 522, 527 (D.S.C.1969).

**73.** On Rule 12(b)(6) motions, see, e.g., *Pauling v. McElroy,* 107 U.S.App.D.C. 372, 373–374, 278 F.2d 252, 253–254, *cert. denied,* 364 U.S. 835, 81 S.Ct. 61, 5 L.Ed.2d 60 (1960); *Homan Mfg. Co. v. Russo,* 233 F.2d 547, 550 (7th Cir.1956); *Ryan v. Scoggin,* 245 F.2d 54, 57 (10th Cir.1957). On Rule 12(c) motions, see, e.g., *Kohen v. H.S. Crocker Co.,* 260 F.2d 790, 792 (5th Cir.1958); *Hargis Canneries, Inc. v. United States,* 60 F.Supp. 729 (D.Ark.1945). Conversely, a trial court should not grant either kind of motion simply because it is dubious of the plaintiff's ability to prove the allegations of the complaint at trial. On Rule 12(b)(6) motions, see, e.g., *Scheuer v. Rhodes, supra* note 11, 416 U.S. at 236, 94 S.Ct. at 1686, 40 L.Ed.2d at 96; *De La Cruz v. Tormey,* 582 F.2d 45, 48 (9th Cir.1978), *cert. denied,* 441 U.S. 965, 99 S.Ct. 2416, 60 L.Ed.2d 1072 (1979). On Rule 12(c) motions, see, e.g., *Wager v. Pro, supra* note 11, 188 U.S. App.D.C. at 3, 575 F.2d at 884; *Kurek v. Pleasure Driveway & Park Dist.,* 583 F.2d 378, 379–380 (7th Cir.1978), *cert. denied,* 439 U.S. 1090, 99 S.Ct. 873, 59 L.Ed.2d 57 (1979). See note 71 *supra.*

**74.** See note 11 *supra.*

Our task is complex, but we know of no simple way to deal with claims of serious and pervasive unconstitutional behavior.

## A. Constitutional Foundations

■ Haynesworth charges that he was victimized by an unmerited prosecution, undertaken in retaliation for his refusal to surrender his right to challenge official misconduct in court.[75] He contends that this course of conduct violated the First and Fifth Amendments.[76] Appellees do not dispute that dismissal of criminal charges cannot constitutionally be predicated upon the putative defendant's willingness to release civil claims against public servants, nor do they contest Haynesworth's ability to challenge this sort of prosecution policy in a *Bivens*-type action. We agree that the retaliatory prosecution constitutes an actionable First Amendment wrong[77] redressable under *Bivens*, but we feel that some elaboration on this conclusion is in order.

The Supreme Court has recognized that, embedded in the First Amendment right to "petition the government for a redress of grievances,"[78] is entitlement to seek recompense in the courts.[79] We ourselves have recently concluded that initiation of a prosecution in order to impede the putative defendant's efforts to vindicate his claims against law enforcement officers inflicted "an injury of constitutional dimension."[80] Even earlier, the practice of tying the initiation or maintenance of criminal charges to an arrestee's unwillingness to abandon claims against police had been perceived as a deprivation of First Amendment rights. In *Dixon v. District of Columbia*,[81] the Corporation Counsel admitted that an alleged traffic violator was prosecuted solely because he had persisted in pressing a complaint against the arresting officers.[82] The panel agreed unanimously that dismissal of the criminal information was appropriate.[83] Chief Judge Bazelon wrote separately on the constitutional implications of the retaliatory prosecution:

> *Illinois State Bar Ass'n,* 389 U.S. 217, 221–223, 88 S.Ct. 353, 356–357, 19 L.Ed.2d 426, 430 (1967); see *MacDonald v. Musick,* 425 F.2d 373, 376 (9th Cir.), *cert. denied,* 400 U.S. 852, 91 S.Ct. 54, 27 L.Ed.2d 90 (1970).

**75.** Complaint, *supra* note 1, ¶ 46, A.App. 22.

**76.** *Id.* ¶ 46, A.App. 22. Haynesworth also claims that the actions of police officers Schwartz, Lyddane and Mooney constituted arrest without probable cause in contravention of the Fourth Amendment. *Id.* ¶¶ 41, 44, A.App. 21. Because the District Court has not yet addressed the claims against those defendants, we have no occasion to consider the alleged Fourth Amendment violation.

**77.** Haynesworth also argues that conditioning dismissal of the criminal charges on release of his civil claims violated the Equal Protection Clause, applicable to the District of Columbia and its officers via the Fifth Amendment. While we agree that disparate treatment on the basis of willingness to forego civil suit is impermissible, it is the First Amendment interest that steers us to that conclusion. Accordingly, we opt to pursue the First Amendment claim, and to forego any equal protection analysis on this appeal. See Simons, *Equality as a Comparative Right,* 65 B.U.L.Rev. 387, 467–472 (1985) (some claims of discriminatory treatment are better understood as assertions that a substantive constitutional right has been abridged).

**78.** U.S. Const. amend. I.

**79.** *NAACP v. Button,* 371 U.S. 415, 429–430, 83 S.Ct. 328, 336, 9 L.Ed.2d 405, 415–416 (1963). This right entitles citizens to petition the court for redress of purely personal injuries. *UMW v.*

**80.** *Martin v. D.C. Metro. Police Dep't, supra* note 71, 259 U.S.App.D.C. at 37, 812 F.2d at 1431.

**81.** 129 U.S.App.D.C. 341, 394 F.2d 966 (1968).

**82.** *Id.* at 343, 394 F.2d at 968 (separate opinion of Bazelon, C.J.).

**83.** *Id.* at 346, 394 F.2d at 971. The District of Columbia stated that it had no objection to dismissal of the information against Dixon because admittedly his prosecution contravened District policy. *Id.* at 345, 394 F.2d at 970. It may have been this rather unusual posture that led the panel to disagree on the manner in which the case ought to be disposed of. Chief Judge Bazelon felt it necessary to reach the merits of Dixon's claim. *Id.* Judge McGowan concurred in dismissal, reasoning that in light of the District's position "this particular litigation has become meaningless." *Id.* at 346, 394 F.2d at 971 (separate opinion of McGowan, J.). Judge Miller believed that the appeal had been improvidently granted, but agreed with Judge McGowan on the disposition appropriate. *Id.* at 346, 394 F.2d at 971 (separate opinion of Miller, J.).

Of course, prosecutors have broad discretion to press or drop charges. But there are limits.... The Government may not prosecute for the purpose of deterring people from exercising their right to protest official misconduct and petition for redress of grievances.[84]

Several other circuits have joined in rejecting the practice challenged in *Dixon*.[85]

■ We realize, of course, that not every attempt to associate dismissal of criminal charges with waiver of civil claims will amount to prosecutorial misconduct or a deprivation of constitutional prerogative. In *Town of Newton v. Rumery*,[86] the Supreme Court found a release-dismissal agreement to be valid and binding against the putative defendant in his subsequent Section 1983 action.[87] While acknowledging that "in some cases [release-dismissal] agreements may infringe important interests of the criminal defendant and of society as a whole," a majority of the Court held that the mere possibility of overreaching should not invalidate the agreement at issue in the face of overwhelming evidence that the bargain was entered into voluntarily, and that the prosecutor acted reasonably and in pursuit of legitimate law enforcement goals.[88] Among the circumstances impressing the majority were that Rumery's own attorney drafted the release-dismissal agreement and counseled his client at length on its benefits and implications, and that the prosecutor's decision to seek a civil release was motivated in large part by his desire to insulate the key witness in a related felony prosecution from the need to testify at Rumery's criminal trial or in his civil suit.[89]

The fact that circumstances may render release-dismissal agreements valid and enforceable does not in any way excuse the conduct alleged in this case. The circumstances attending the decision to press charges against Haynesworth strengthen his assertion that the decision to prosecute was motivated solely by the desire to prevent him from seeking judicial redress for alleged police misconduct; the *Rumery* Court in no wise intended to legalize such

84. *Id.* at 343, 394 F.2d at 968 (separate opinion of Bazelon, C.J.). In his view, a retaliatory prosecution could work a deprivation of both First Amendment and equal protection rights. *Id.* See note 77 *supra*.

85. See *Sexton v. Ryan*, 804 F.2d 26 (2d Cir.1986) (validity of waiver of civil claims is suspect where plaintiff forced to choose between abandoning complaint and facing criminal charges); *Boyd v. Adams*, 513 F.2d 83, 88–89 (7th Cir. 1975) (§ 1983 plaintiff entitled to injunctive relief against practice of retaliatory prosecution); *MacDonald v. Musick, supra* note 79, 425 F.2d at 375 (state defendant entitled to writ of habeas corpus for retaliatory prosecution); *Lusby v. T.G. & Y. Stores, Inc.*, 749 F.2d 1423, 1431 (10th Cir.1984) (affirming award of damages in § 1983 action alleging retaliatory prosecution), *vacated for reconsideration,* — U.S. —, 106 S.Ct. 40, 88 L.Ed.2d 33 (1985).

86. — U.S. —, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987).

87. *Id.* at —, 107 S.Ct. at 1194. Four members of the Court, in an opinion authored by Justice Powell, concluded that release-dismissal agreements should be viewed with the same presumption of regularity and good faith accorded to the deployment of charging discretion in the plea-bargaining context. *Id.* at — , 107 S.Ct. at 1192–1194 (plurality opinion) (citing *Wayte v. United States,* 470 U.S. 598, 607, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547, 556–557 (1985); *United States v. Goodwin,* 457 U.S. 368, 373, 102 S.Ct. 2485, 2488, 73 L.Ed.2d 74, 80 (1982); and *Bordenkircher v. Hayes,* 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978)). Justice O'Connor wrote separately to emphasize that, although the agreement at issue passed constitutional muster, those seeking to enforce such agreements must prove that the bargain "was voluntarily made, not the product of prosecutorial overreaching, and in the public interest." — U.S. at — – —, 107 S.Ct. at 1194–1196 (O'Connor, J., concurring in part and concurring in the judgment). Justice O'Connor joined those portions of the lead opinion assaying the circumstances surrounding the release-dismissal agreement under consideration and concluding that the agreement was legitimate. *Id.* at —, 107 S.Ct. at 1194. Those portions of the lead opinion in which Justice O'Connor joined the plurality will hereinafter be labeled 'majority opinion.'

88. *Id.* at —, —, 107 S.Ct. at 1190, 1194 (majority opinion).

89. *Id.* at —, 107 S.Ct. at 1194 (majority opinion). The plurality apparently relied also on its own assessment that Rummery's civil claims were unfounded: "To the extent release-dismissal agreements protect public officials from the burdens of defending ... unjust claims, they further [an] important public interest." *Id.* at —, 107 S.Ct. at 1192 (plurality opinion).

an abuse of prosecutorial power.[90] It does not appear, at least as yet, that pursuance of the release was motivated by any legitimate law enforcement objective, and it may be that there was no good reason for lodging the criminal charge against Haynesworth in the first place. The *Rumery* Court concluded that the possibility of prosecutorial misconduct should not invalidate release-dismissal agreements entered into voluntarily and in good faith; by the same logic, the possibility of meritorious release-dismissal agreements in suitable circumstances does not condone the prosecutorial overreaching and coercion alleged in Haynesworth's complaint.

■ In sum, we see no reason to retreat from the settled principle that it is "patently unconstitutional" to "penaliz[e] those who choose to exercise" constitutional rights.[91] We share the conviction of forerunning determinations that retaliatory prosecution unconstitutionally impinges on the right of access to the courts guaranteed by the First Amendment. Haynes-worth alleged that he was charged with disorderly conduct solely because he refused to release his civil claims against the arresting officers.[92] That averment, we think, partakes from the circumstances enough substance to entitle him to proceed directly under the First Amendment for damages.[93] This conclusion parallels our holding in *Dellums v. Powell*,[94] that a *Bivens* action can be utilized by complainants asserting an infringement of their First Amendment right to petition Congress for redress of grievances.[95] That Haynes-worth avers interference with his right to entreat the courts rather than the legislature does not weaken the *Dellums* rationale.[96]

### B. The Nexus Between the Appellees and the Constitutional Violation Alleged

The District Court's dismissal of Haynesworth's complaints against the District of Columbia, Miller, Jefferson and Cullinane, and its judgment in favor of Gildon, were

---

90. See *id.* at ——, 107 S.Ct. at 1192 (plurality opinion) (acknowledging concern that in some cases prosecutors may " 'trump up charges in reaction to a defendant's civil rights claim, suppress evidence of police misconduct, and leave unremedied deprivations of constitutional rights' ") (quoting *Rumery v. Town of Newton*, 778 F.2d 66, 69 (1st Cir.1985), *rev'd*, —— U.S. ——, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987)); —— U.S. at ——, 107 S.Ct. at 1194 (O'Connor, J., concurring in part and concurring in the judgment) (recognizing risk that "[t]he coercive power of criminal process may be twisted to serve the end of suppressing complaints against official abuse").

91. *United States v. Jackson*, 390 U.S. 570, 581, 88 S.Ct. 1209, 1216, 20 L.Ed.2d 138, 147 (1968); see also *Brady v. United States*, 397 U.S. 742, 746, 90 S.Ct. 1463, 1467, 25 L.Ed.2d 747, 755 (1970) (government may not " 'needlessly penalize[ ] the assertion of a constitutional right' ") (quoting *United States v. Jackson, supra*, 390 U.S. at 583, 88 S.Ct. at 1217, 20 L.Ed.2d at 147).

92. Complaint, *supra* note 1, ¶ 33, A.App. 18.

93. In *Wilson v. Thompson*, 593 F.2d 1375 (5th Cir.1979), the court set out the essential elements of a retaliatory-prosecution claim in a § 1983 action for injunctive relief:

The Court should consider whether the plaintiffs have shown, first, that the conduct allegedly retaliated against or sought to be deterred was constitutionally protected, and, second, that the State's bringing of the criminal prosecution was motivated at least in part by a purpose to retaliate for or to deter that conduct. If the Court concludes that the plaintiffs have successfully discharged their burden of proof on both of these issues, it should then consider a third: whether the State has shown by a preponderance of the evidence that it would have reached the same decision as to whether to prosecute even had the impermissible purpose not been considered.

*Id.* at 1387 (footnote omitted). There appears to be no reason why the same analytic framework should not be employed in constitutional actions. See generally note 1 *supra*.

94. 184 U.S.App.D.C. 275, 566 F.2d 167 (1977), *cert. denied*, 438 U.S. 916, 98 S.Ct. 3147, 57 L.Ed.2d 1161 (1978).

95. *Id.* at 302–303, 566 F.2d at 194–195.

96. In *Dellums*, we reasoned that federal courts, from their broad experience in fashioning injunctive relief for First Amendment violations, would be capable of resolving issues of causation and magnitude of harm that could be raised in a constitutional damage action. *Id.* at 302, 566 F.2d at 194. Additionally, we found that the task of assessing damages for injuries to First Amendment interests would not present particularly difficult problems of judicial administration. *Id.* at 303, 566 F.2d at 195.

not based on any defect in the constitutional claim alleged. Instead, those orders were premised on a determination that these defendants were not sufficiently implicated in the retaliatory prosecution averred to establish liability. We now consider the validity of that assessment by examining the participation of each in the constitutional infringement charged, and the theories under which that participation might form a basis for recovery.

### 1. Officer Gildon

■ Haynesworth stated that Officer Gildon participated willfully and directly in the prosecution.[97] It seems beyond peradventure that a complaint averring knowing participation by the defendant in an actionable constitutional deprivation sets forth a colorable claim. Nonetheless, the District Court summarily granted Gildon's motion for judgment on the pleadings,[98] but since the court did not articulate its reasons therefor, we are left uncertain as to its rationale. The only basis existent at the close of the pleadings for a determination on Gildon's entitlement to judgment as a matter of law[99] was the complaint's narration of the conference attended by Gildon, Haynesworth and others. Although the complaint tells us that Gildon informed Haynesworth that he would be prosecuted if he refused to waive his civil claim, it also

discloses that prosecutor Miller stated that any decision to proceed with or drop the charges would be made by him and not the police.[100] We can only surmise that the District Court viewed this latter averment as an indication that Gildon had no authority over—and thus no responsibility for—prosecutorial decisions.

We do not believe, however, that the asserted exchange exculpates Gildon at this very preliminary stage of the litigation. Miller's statement can plausibly be taken as no more than an admonition that Gildon should allow the prosecutor to handle the negotiations. Even accepting the statement as immutable proof that Gildon could not have exerted any influence on the decision to go forward, Gildon's actions could still have contributed to a constitutional violation, since Haynesworth may not have known that she was powerless in that regard, and might have waived his right to sue in partial reliance upon her statement.[101] Under the applicable standard,[102] the District Court should not have terminated litigation of this claim at such an early stage.[103]

### 2. Chiefs Jefferson and Cullinane

Haynesworth averred that former Chiefs of Police Jefferson and Cullinane were directly responsible for the alleged retali-

---

**97.** The allegation that Gildon harbored an unconstitutional motive is not set forth conclusorily; rather it consisted of statements made by Gildon which constitute direct evidence of an improper purpose. Thus the complaint satisfied this court's particularity requirements. See note 71 *supra.*

**98.** See *Haynesworth v. Miller, supra* note 56, A.App. 58.

**99.** See note 11 *supra.*

**100.** See text *supra* at note 43. On appeal, Gildon's argument on the retaliatory prosecution claim centers on the significance of this exchange. Brief for Appellee Gildon at 3.

**101.** In a related context, the Supreme Court has emphasized that state apparatuses serving to penalize criminal defendants who exercise their rights to procedural protections are unconstitutional, not because they are actually fueled by a vindictive animus on the part of the state, but because they breed apprehension that the state

will retaliate against those who claim their legal entitlements. See *North Carolina v. Pearce,* 395 U.S. 711, 725, 89 S.Ct. 2072, 2080, 23 L.Ed.2d 656, 669 (1969) ("since the fear of such vindictiveness may unconstitutionally deter a defendant's exercise of the right to appeal or collaterally attack his first conviction, due process also requires that a defendant be freed of apprehension of such a retaliatory motivation on the part of the sentencing judge"); see also *Blackledge v. Perry,* 417 U.S. 21, 28, 94 S.Ct. 2098, 2102, 40 L.Ed.2d 628, 634 (1974). Similarly, in the present case, although Gildon denies the ability to effectuate the threat of prosecution, her comments may well have been enough to cause Haynesworth to fear that a civil suit against the officers would provoke official retaliation.

**102.** See text *supra* at notes 71–74.

**103.** We affirm the District Court's dismissal of Haynesworth's commonlaw claims of false arrest and assault and battery since he did not allege any participation by Gildon therein.

atory prosecution because they did not adequately instruct their subordinates on the impropriety of such prosecutions,[104] and vicariously liable under a theory of respondeat superior.[105] The District Court dismissed Jefferson and Cullinane from the suit on the grounds that the doctrine of respondeat superior did not apply and that there was an insufficient showing of personal involvement by them in the purported constitutional violation.[106] While we concur in the District Court's rejection of the respondeat superior claims and in the determination of insufficient participation by Jefferson, we find that the court's exoneration of Cullinane did not take adequate account of Haynesworth's allegation of improper supervision.

■ We can easily dispose of the assertion of respondeat-superior liability. Haynesworth contends that the two former chiefs are responsible for the actions of the police officers by virtue of their dominant roles in the employment relationship.[107] This argument collides with the firmly entrenched principle that public officials are not vicariously responsible for the acts of their subordinates.[108] Analytically, high-level public officials, are not employers of their subordinates but rather are fellow governmental servants, and it thus is inappropriate to hold them liable on the basis of respondeat superior.

■ We also concur in the District Court's dismissal of the claims against Jefferson. He took office as Chief of Police

as the events in question drew to a close, and was properly dismissed from the litigation because the complaint does not adequately allege any failing on his part.[109] However remiss he may have been in failing to remedy the District's alleged policy of retaliatory prosecution—a matter on which we intimate no view—no corrective action on his part could have aided Haynesworth since the harm he asserts had already taken place.

Haynesworth's claim that Cullinane is liable for failure to supervise the officers under his command is not so easily discarded. It requires us to consider the parameters of supervisory liability for constitutional violations and to view the allegations of the complaint against that template. This analysis leads us to disagree with the District Court's conclusion that Cullinane's role in the constitutional infringement charge could not under any circumstances support a finding of liability.

(a) *Supervisory and Training Liability*

■ It is well established that a governmental officer may be held liable in damages for constitutional wrongs engendered by his failure to supervise or train subordinates adequately.[110] This responsibility is not premised on the notion of vicarious liability; rather, it is bottomed on the principle that in some contexts failure of an official to safeguard against constitutional transgressions by those under his control

104. Complaint, *supra* note 1, ¶¶ 44–45, A.App. 21.

105. Joint Brief for Appellants at 45–48.

106. *Memorandum Opinion, supra* note 60, at 7, A.App. 54.

107. Joint Brief for Appellants at 45–48.

108. *Robertson v. Sichel,* 127 U.S. 507, 515–516, 8 S.Ct. 1286, 1290, 32 L.Ed. 203, 206 (1888); *Lander v. Morton,* 171 U.S.App.D.C. 146, 149, 518 F.2d 1084, 1087 (1975); *Tucker v. Duke,* 107 U.S.App.D.C. 253, 254, 276 F.2d 499, 500 (1960) (concurring opinion).

109. The complaint states simply that, "[o]n information and belief, Defendant Jefferson has

either acquiesced in the practice [of retaliatory prosecution] or, due to negligent supervision, failed to become aware of and prevent it, although then able to do so." Complaint, *supra* note 1, ¶ 45, A.App. 22.

110. E.g., *Slakan v. Porter,* 737 F.2d 368, 372 (4th Cir.1984), *cert. denied,* 470 U.S. 1035, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985); *Sims v. Adams,* 537 F.2d 829, 832 (5th Cir.1976); *Hays v. Jefferson County,* 668 F.2d 869, 872 (6th Cir.), *cert. denied,* 459 U.S. 833, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982); *Hahn v. McLey,* 737 F.2d 771, 773 (8th Cir.1984) (per curiam); *McClelland v. Facteau,* 610 F.2d 693, 695 (10th Cir.1979); *Fundiller v. City of Cooper City,* 777 F.2d 1436, 1443 (11th Cir.1985). The issue has generally surfaced in actions brought under § 1983, but the analysis in these cases is equally valid in the constitutional context. See generally note 1 *supra.*

constitutes an actionable wrong under *Bivens* and Section 1983. The party seeking to impose liability must demonstrate that the official had an obligation to supervise or train the wrongdoer in the manner alleged, that the duty was breached, and that this breach was a proximate cause of the injury.[111] But while there is consensus on the existence of an actionable duty in this regard, the contours of that duty are unclear.[112]

This court held in *Carter v. Carlson*[113] that a police chief would be liable for negligent failure to prevent constitutional impingements by his subordinates, thereby implying that such officials have a duty to supervise and train to foreclose all reasonably foreseeable constitutional harms.[114] While this decision arguably carries weight,[115] we have reason to question its continuing vitality in light of subsequent decisions of the Supreme Court[116] and other circuits[117] suggesting that the standard of culpability is higher.[118] Accordingly, we consider the question anew.

In *Rizzo v. Goode*,[119] the Supreme Court vacated an order providing equitable relief against city officials for failure to supervise municipal police officers. The Court noted that supervisory liability under Section 1983 had important limitations: it required an "affirmative link between the occurrence of the various incidents of police misconduct and the adoption of any plan or policy by petitioners—express or otherwise—showing their authorization or approval of such misconduct."[120] Rejecting the "amorphous proposition[ ]" that the officials implicated shared "a constitutional 'duty' . . . to 'eliminate' future police misconduct,"[121] the Court saw no foundation for the asserted liability absent a "showing of direct responsibility" by the supervising official for the infringement.[122]

Applying the tenets of *Rizzo*, numerous courts have concluded that something more than mere negligence on the part of the supervisor is necessary to state a claim under *Bivens* or Section 1983.[123] These courts have asserted that, in order to construct a basis for liability, the injured party must establish that the supervising official was either "grossly negligent" or "deliberately indifferent" in failing to take precau-

---

**111.** *Carter v. Carlson, supra* note 11, 144 U.S. App.D.C. at 395, 447 F.2d at 365; *Sims v. Adams, supra* note 110, 537 F.2d at 831–832; *McClelland v. Facteau, supra* note 110, 610 F.2d at 695.

**112.** See *Hays v. Jefferson County, supra* note 110, 668 F.2d at 872–873 (tracing divergent lines of analysis employed by circuits in determining scope of supervisory liability).

**113.** *Supra* note 11.

**114.** 144 U.S.App.D.C. at 395 & n. 20; 447 F.2d at 365 & n. 20.

**115.** *Carter* was reversed on other grounds by the Supreme Court. See *District of Columbia v. Carter, supra* note 1 (finding error in application of § 1983 to the District of Columbia, without addressing question of supervisory responsibility). Thus it would seem to constitute good authority on the supervisory-liability question. But cf. *Carter v. District of Columbia*, 254 U.S. App.D.C. 71, 77–78, 795 F.2d 116, 122–123 (1986) (discussing the scope of municipal liability for supervisory nonfeasance without referring to the earlier *Carter* decision).

**116.** See notes 119–122 *infra* and accompaning text.

**117.** See notes 123–127 *infra* and accompanying text.

**118.** See *Hays v. Jefferson County, supra* note 110, 668 F.2d at 873 n. 2 (noting that *Carter v. Carlson* is contrary to the weight of authority, and remarking "it is significant that this case predates the Supreme Court's decision in *Rizzo*") (citing *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976)). See notes 119–122 *infra*.

**119.** *Supra* note 118.

**120.** 423 U.S. at 371, 96 S.Ct. at 604, 46 L.Ed.2d at 569–570.

**121.** *Id.* at 376, 96 S.Ct. at 606, 46 L.Ed.2d at 572.

**122.** *Id.*

**123.** See, e.g., *Duchesne v. Sugarman*, 566 F.2d 817, 830–831 (2d Cir.1977); *Hays v. Jefferson County, supra* note 110, 668 F.2d at 872; *Henriksen v. Bentley*, 644 F.2d 852, 854 (10th Cir.1981); *Leite v. City of Providence*, 463 F.Supp. 585, 589–590 (D.R.I.1978).

tions against the constitutional violation that did in fact occur.[124] This standard of culpability for supervisory officials has been justified by a recognition that imposition of a duty of care to prevent all foreseeable misconduct by subordinates would thrust an excessive burden on supervisors and hamper performance of official duties.[125] Despite differences in articulations of the applicable standard [126] and the underlying rationale,[127] the overwhelming majority of courts faced with claims of supervisory liability after *Rizzo* have determined that, where responsibility is predicated on inattentiveness rather than affirmative misconduct, the plaintiff must establish a high degree of fault in order to implicate the supervisor in the constitutional infractions of his subordinates.

■ We agree that *Rizzo* mandates a retreat from the standard proclaimed in *Carter v. Carlson,* and join the majority of courts calling for something more than mere negligence to forge the "affirmative link" between the constitutional infringement and the supervisor's conduct. Consideration of the exigencies of criminal law enforcement also suggests that a higher standard is appropriate, given the wide range of constitutional breaches arguably "foreseeable" in the daily operations of a law enforcement agency, and the difficulty of providing meaningful guidance to ward off all possible wrongs.[128] The duty to supervise is triggered by proof that, absent effective supervision, harm was not merely foreseeable, but was highly likely, given the circumstances of the case. When inaction in the face of a substantial threat of harm is shown, it can be said that the supervisor acquiesced in the resulting constitutional violation, thereby "linking" the non-feasance with the injury in the manner required by *Rizzo*.

It remains to delineate those situations that trigger the duty to supervise under *Bivens* and Section 1983. Courts requiring "gross negligence" or "deliberate indifference" have held that standard satisfied where a supervisor remains passive in the face of past constitutional violations about which he knew or should have known.[129] Some of these courts have also concluded that a duty to supervise may arise, even absent a pattern of past transgressions, where training has been so clearly deficient that some deprivation of rights will inevita-

**124.** *Hays v. Jefferson County, supra* note 110, 668 F.2d at 872–873; *Leite v. City of Providence, supra* note 123, 463 F.Supp. at 589–590.

**125.** *Hays v. Jefferson County, supra* note 110, 668 F.2d at 873; *Leite v. City of Providence, supra* note 123, 463 F.Supp. at 588–589 n. 2. Some courts have viewed the negligence-plus requirement as a necessary corollary of the "good faith" immunity defense. See *McClelland v. Facteau, supra* note 110, 610 F.2d at 696; *Leite v. City of Providence, supra* note 123, 463 F.Supp. at 588–589 & n. 2. See note 159 *infra.* To the extent that these decisions rested on the subjective "good faith" immunity standard articulated in *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), which was subsequently retooled in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), their comments on the nexus between immunity and culpability are of questionable validity. See generally Gildon, *The Standard of Culpability in Section 1983 and* Bivens *Actions: the Prima Facie Case, Qualified Immunity and the Constitution,* 11 Hofstra L.Rev. 557 (1983) (noting that the *Harlow* immunity standard has no bearing on the requirements of the plaintiff's prima facie case under *Bivens* or § 1983).

**126.** *See Hays v. Jefferson County, supra* note 110, 668 F.2d at 873 (collecting cases).

**127.** Compare *id.* at 872 (*Rizzo* requires proof of gross negligence or deliberate indifference before supervisory liability will attach) with *Sims v. Adams, supra* note 110, 537 F.2d at 832 (applying a negligence-plus standard to supervisory liability claim, but distinguishing *Rizzo* on the grounds that that case implicated issues of comity and federalism not presented in *Sims* ).

**128.** The negligence standard might actually undermine effective preventive training, since a legal requirement to instruct against all possible violations would likely dilute the instruction provided on the most egregious probable wrongs.

**129.** E.g., *Slakan v. Porter,* 737 F.2d 368, 376 (4th Cir.1984), *cert. denied,* 470 U.S. 1035, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985); *Sims v. Adams, supra* note 110, 537 F.2d at 832; *Hays v. Jefferson County, supra* note 110, 668 F.2d at 874; *McClelland v. Facteau, supra* note 110, 610 F.2d at 697; *Fundiller v. City of Cooper City, supra* note 110, 777 F.2d at 1443; *Leite v. City of Providence, supra* note 123, 463 F.Supp. at 590.

bly result absent additional instruction.[130] In general, the existence of a duty to supervise to prevent a particular harm is a question of fact rather than law, and depends on the particulars of each dispute.[131]

■ We hold today that the close analogy to *Rizzo* requires us to constrict the ambit of supervisory liability for constitutional wrongs. Our decision does not shift the level of culpability required to establish the underlying violation; that must turn on the nature of the constitutional provision allegedly infringed.[132] Nor does it affect the showing essential to municipal liability for inadequate supervision, since the problem of determining whether a governmental entity should be charged with responsibility for the acts of its employees is conceptually distinct from the question whether the wrongs of one municipal worker should be imputed to another.[133] Our holding is that, in order to find a supervisory official personally liable in damages for the unconstitutional acts of his subordinate, it must be shown that he was responsible for supervising the wrongdoer; that a duty to instruct the subordinate to prevent constitutional harm arose from the surrounding circumstances; and that, as a result of the official's failure to instruct, the plaintiff was harmed in the manner threatened. We turn now to Haynesworth's complaint against Cullinane to ascertain whether it states a colorable claim for relief under this standard.

### (b) *Sufficiency of the Allegations Against Appellee Cullinane*

■ As we have stated, a motion to dismiss pursuant to Rule 12(b)(6) should be denied if it appears from the complaint that the plaintiff might be able to prove some set of facts which would provide a basis for liability.[134] Evaluated according to this liberal standard, we think the District Court's dismissal of Cullinane from the lawsuit was premature. Haynesworth's complaint alleged that Cullinane was charged with the responsibility of supervising the wrongdoing officers;[135] that a practice of retaliatory prosecution had unfolded in the Dis-

130. E.g., *Hays v. Jefferson County, supra* note 110, 668 F.2d at 874; *McClelland v. Facteau, supra* note 110, 610 F.2d at 697; *Leite v. City of Providence, supra* note 123, 463 F.Supp. at 590–591; cf. *Owens v. Haas,* 601 F.2d 1242, 1246 (2d Cir.), *cert. denied,* 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979) (municipality may be held liable for harm resulting from single act by subordinate employee, where supervisor was "deliberate[ly] indifferent" to gross inadequacies of existing training program).

131. See *Turpin v. Mailet,* 619 F.2d 196, 201 (2d Cir.), *cert. denied,* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980).

132. E.g., *Estelle v. Gamble,* 429 U.S. 97, 105–106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251, 261 (1976) (in order to establish Eighth Amendment violation stemming from improper medical treatment, state prisoner must show action under color of state law with "deliberate indifference" to prisoner's medical needs); *Daniels v. Williams,* 474 U.S. 327, ——, 106 S.Ct. 662, 666, 88 L.Ed.2d 662, 668 (1986) (infringement of Due Process Clause of Fourteenth Amendment not satisfied by proof that state actor negligently caused unintended deprivation of liberty or property). We have already observed, note 93 *supra* and accompanying text, that establishment of a First Amendment claim of retaliatory prosecution requires proof that a governmental official acted with intent to deprive the plaintiff of his First

Amendment right. Moreover, as we have stated, note 71 *supra,* the plaintiff must plead this assertion of unconstitutional motive with some particularity. But once such a violation is established, we think an official charged with supervising the wrongdoer may be held liable for dereliction of duty regardless of whether he harbored an improper motive of his own. See generally Gildon, *supra* note 125 (distinguishing the level of culpability necessary to establish the constitutional deprivation from that required to state a claim under *Bivens* or § 1983).

133. We note that the parameters of municipal liability for the acts of supervisory personnel are unclear. See note 232 *infra.* While some courts have equated municipal and supervisory liability, see *Leite v. City of Providence, supra* note 123, 463 F.Supp. at 589, we believe that the question whether a failure to supervise constitutes a municipal policy or custom implicates concerns beyond the scope of our discussion here. See *Carter v. District of Columbia, supra* note 115, 254 U.S.App.D.C. at 77–78, 795 F.2d at 122–123 (discussing the scope of municipal liability for inadequate supervision by city officials).

134. See note 71 *supra.*

135. Complaint, *supra* note 1, ¶ 7, A.App. 10.

trict of Columbia;[136] that Cullinane failed to supervise or instruct his officers in order to guard against further outbreaks of retaliation;[137] and that Haynesworth's injuries resulted from that failure.[138] Additionally, we may infer[139] that the police participated in the prior acts of retaliatory prosecution, and that the police chief was or should have been aware thereof. Cast in the light most favorable to Haynesworth, these facts, if proven, could sustain a finding of liability on the part of Cullinane.

It will be for Haynesworth to substantiate his claim that there was a past practice of retaliatory prosecutions, and that the police participated therein with the knowledge—or at least the indifference—of Cullinane. Haynesworth should be afforded some opportunity to verify these claims through discovery since the operative information is largely in the hands of adverse parties.[140] Correspondingly, Cullinane should be given a chance to counter Haynesworth's allegations with factual information, and to develop the affirmative defense of good faith immunity.[141] We do not, of course, assess Haynesworth's chance of prevailing at trial, but believe that his complaint sets forth enough to

withstand a motion under Rule 12(b)(6) and to enable him to proceed with discovery.[142]

### 3. *Corporation Counsel Miller*

Haynesworth's complaint asserted liability against Assistant Corporation Counsel Miller on the ground of direct complicity in the prosecution alleged, and on the further ground of supervision and promotion of the retaliatory policy.[143] The District Court dismissed the claims against Miller in the belief that he enjoyed complete prosecutorial immunity from suit.[144] We concur in this determination, but are constrained to elaborate upon the principles underlying the application of prosecutorial immunity in this case. Accordingly, we discuss the legal theory of policymaking liability asserted against Miller, the sufficiency of the complaint in charging liability, and the bases for our conclusion that, notwithstanding Haynesworth's allegations, Miller is absolutely immune from liability therefor.

### (a) *Policymaking Liability*

Governmental officials may also be held personally liable in damages for constitutional infringements resulting from their establishment of unconstitutional poli-

---

**136.** *Id.* ¶ 34, A.App. 18. While Haynesworth states that this pattern developed under the auspices of the Corporation Counsel, it would seem more likely than not that police officers—the beneficiaries of the practice—abetted the prior incidents of retaliatory prosecution, just as they allegedly did in the case before us.

**137.** *Id.* ¶ 44, A.App. 22–23. While Haynesworth alleges that Cullinane was "negligent" in his failure to supervise, this averment will not defeat the action so long as the complaint otherwise furnishes a basis for attributing to Cullinane some higher degree of fault.

**138.** *Id.,* A.App. 22–23.

**139.** See notes 74, 136 *supra.* Our ability to draw reasonable inferences from Haynesworth's complaint against Cullinane is not circumscribed by this court's admonition in *Hobson v. Wilson, supra* note 71, that allegations of unconstitutional motive be pleaded with some specificity. 237 U.S.App.D.C. at 248, 737 F.2d at 30. The claim against Cullinane is not founded upon any malicious intent on his part, but upon his acquiescence in the wrongful acts of others. Since the underlying constitutional violation—

including the motive element—has been set forth with sufficient particularity, we are at liberty to draw reasonable inferences with regard to Cullinane's implication therein.

**140.** *Owens v. Haas, supra* note 130, 601 F.2d at 1246 (where the plaintiff's complaint alleges an incident severe enough to raise an inference of "deliberate indifference" on the part of the supervisor, court allows limited discovery to determine whether such indifference can be shown).

**141.** See note 159 *infra.*

**142.** As the Second Circuit noted in *Owens v. Haas, supra* note 130, this outcome accommodates the interest in curbing vexatious and groundless litigation against city officials, and at the same time provides plaintiffs with an adequate opportunity to press their constitutional claims in court. 601 F.2d at 1246.

**143.** Complaint, *supra* note 1, ¶¶ 34–35, A.App. 18–19.

**144.** *Memorandum Opinion, supra* note 60, at 4–5, A.App. 51–52.

cies.[145] In contrast to supervisory or training liability, policymaking liability rests upon the official's misfeasance rather than his nonfeasance.[146] For an official to be held accountable on this basis, he must actually prescribe policy—formally or de facto [147]—that encourages improper means or ends. To succeed on a policymaking theory, a plaintiff must demonstrate that the official against whom liability is asserted has the power—vested either formally or as a practical matter—to formulate policy, and has exercised that policymaking authority to generate improper practices. As in the case of supervisory liability, a plaintiff seeking to recover against a policymaking official must demonstrate a causal connection between the policy established and the wrong committed against him.[148]

### (b) Sufficiency of the Allegations Against Appellee Miller

■ The complaint adequately sets forth a cause of action against Miller, both for direct participation in the retaliatory prosecution alleged and for his policymaking role. With regard to the latter, the complaint points to Miller's responsibility for establishing and implementing policy for the Corporation Counsel,[149] and his promotion and pursuance of an agenda of retaliatory prosecution.[150] But while we find that the complaint's allegations of wrongdoing against Miller meet the requirement of particularity, we conclude that he is absolutely immune from this suit.

### (c) Prosecutorial Immunity [151]

As an officer of the District of Columbia, Miller has at least qualified immunity from suit for all activities undertaken within the scope of his duties as Assistant Corporation Counsel.[152] Haynesworth initially contends that, regardless of the protection otherwise applicable, Miller's conduct was so palpably beyond the scope of his authority that the cloak of official immunity should be cast aside.[153] Haynesworth directs our attention to a decision by this court [154] and a prior directive of the Corporation Counsel's Office,[155] both reflecting disapproval

---

**145.** In some contexts, promulgation of unconstitutional policies by city officials may lead to municipal as well as personal liability for harm occasioned thereby. See Part III(B)(4) *infra.*

**146.** See *Duchesne v. Sugarman, supra* note 123, 566 F.2d at 831. This distinction does not affect the scope of liability; recovery should be allowed for all harm traceable to official action or inaction. *Id.* at 832 (citing *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 725, 81 S.Ct. 856, 861, 6 L.Ed.2d 45, 52 (1961)).

**147.** Compare *Duchesne v. Sugarman, supra* note 123, 566 F.2d at 830–831 (challenge to a written official directive) with *Wanger v. Bonner,* 621 F.2d 675, 679–680 & n. 1 (5th Cir.1980) (challenge to a tacit informal policy).

**148.** See text *supra* following note 138.

**149.** Complaint, *supra* note 1, ¶ 4, A.App. 10.

**150.** *Id.* ¶¶ 34–35, A.App. 18–19. The existence of a written directive prohibiting the latter practices may interpose difficulty in proving that the alleged policy existed, see note 239 *infra* and accompanying text, but would not as a matter of law remove liability if indeed Miller systematically encouraged retaliatory prosecution.

**151.** We need not, for the purpose of assessing immunity, distinguish *Bivens* actions from suits brought against state officers pursuant to § 1983; in fact, the Supreme Court counsels that it would be "'untenable'" to draw such a distinction. *Harlow v. Fitzgerald, supra* note 125, 457 U.S. at 818 n. 30, 102 S.Ct. at 2738 n. 30, 73 L.Ed.2d at 410 n. 30 (quoting *Butz v. Economou,* 438 U.S. 478, 504, 98 S.Ct. 2894, 2909, 57 L.Ed.2d 895, 914 (1978)). See generally note 1 *supra.*

**152.** E.g., *Wood v. Strickland, supra* note 125, 420 U.S. at 315, 321–322, 95 S.Ct. at 997, 1000, 43 L.Ed.2d at 221, 224–225; *Scheuer v. Rhodes, supra* note 11, 416 U.S. at 247–249, 94 S.Ct. at 1692, 40 L.Ed.2d at 103–104.

**153.** Joint Brief for Appellants at 23–25; Reply Brief for Appellants at 1–5.

**154.** *Dixon v. District of Columbia, supra* note 81, 129 U.S.App.D.C. at 343, 394 F.2d at 968. See notes 81–84 *supra* and accompanying text.

**155.** Letter from the President, Board of Commissioners, District of Columbia, to National Capital Area Civil Liberties Union (Feb. 3, 1964), *quoted in Dixon v. District of Columbia, supra* note 81, 129 U.S.App.D.C. at 344, 394 F.2d at 969. The directive, in relevant part, reveals that

[t]he Corporation Counsel states that he has issued directions to his staff forthwith to discontinue the practice of demanding releases

of the practice of retaliatory prosecution, and argues that Miller's actions taken in derogation of these authorities do not merit immunity. We believe Haynesworth presumes a sphere of protected activity far narrower than that countenanced by the caselaw.

The Supreme Court has staked out expansive boundaries for official immunity, so that a governmental employee forfeits protection only when he acts "manifestly or palpably beyond his authority."[156] Under this standard, the conduct at issue did not destroy Miller's immunity. As Chief of the Law Enforcement Section, Miller possessed authority to establish and implement policies governing criminal prosecutions.[157] Since Haynesworth's claim for damages against Miller rests on the establishment and implementation of prosecution policy, the activities challenged fall clearly within the realm of official immunity. And Miller does not lose this protection simply because his exercise of authority impinged upon Haynesworth's constitutional rights; if an allegation of unconstitutional action sufficed to remove the immunity shield, immunity would never be available in *Bivens* actions and only seldom in suits under

Section 1983.[158] Nor are we constrained to cast immunity aside simply because Miller may have contravened a thirteen-year-old policy directive. Even assuming that the policy statement might otherwise have still been in force during the period relevant here, it is entirely plausible that the power to amend outdated directives reposed within the parameters of Miller's general policymaking authority. Accordingly, we conclude that the conduct challenged was not so far afield of Miller's official duties as to deprive him of the immunity applicable.

We must now ascertain the nature of the immunity that attaches to Miller's activities, and a great deal turns on this determination. If Miller enjoys only qualified immunity for the conduct at issue, then additional pleadings are necessary to evaluate whether he is entitled to protection in this case.[159] Accordingly, if qualified immunity carries the day, the District Court's disposition of the complaint against Miller under Rule 12 was erroneous. If, on the other hand, Miller is entitled to absolute immunity for the establishment and implementation of prosecution policies, then Haynesworth's suit against him is "defeat[ed] at

[of claims against police officers] in exchange for the dropping of charges, and not to allow their discretion in the manner of a nolle prosequi to be influenced by a desire to protect and exonerate the arresting officer from civil liability.

156. *Spalding v. Vilas,* 161 U.S. 483, 498, 16 S.Ct. 631, 637, 40 L.Ed. 780, 786 (1896); see *Briggs v. Goodwin,* 186 U.S.App.D.C. 179, 184–185, 569 F.2d 10, 15–16 (1977), *cert. denied,* 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978) (applying the broad standard of *Spalding* to find official's conduct protected); cf. *Stump v. Sparkman,* 435 U.S. 349, 357, 98 S.Ct. 1099, 1105, 55 L.Ed.2d 331, 339 (1978) (judge enjoys immunity unless he acts in the "'clear absence of all jurisdiction'") (quoting *Bradley v. Fisher,* 80 U.S. (13 Wall) 335, 351, 20 L.Ed. 646, 651 (1872)).

157. Indeed, Haynesworth invoked Miller's policymaking authority as a predicate to liability for the retaliatory prosecution. Complaint, *supra* note 1, ¶ 4, A.App. 10.

158. See *Martin v. D.C. Metro. Police Dep't, supra* note 71, 259 U.S.App.D.C. at 35, 812 F.2d at 1429; *Briggs v. Goodwin, supra* note 156, 186

U.S.App.D.C. at 184, 569 F.2d at 15; *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir.1949), *cert. denied,* 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950).

159. Qualified immunity protects "'government officials performing discretionary functions ... insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hobson v. Wilson, supra* note 71, 237 U.S.App.D.C. at 244, 737 F.2d at 25 (quoting *Harlow v. Fitzgerald, supra* note 125, 457 U.S. at 818, 102 S.Ct. at 2738, 73 L.Ed.2d at 410). A determination on whether qualified immunity applies in a particular case requires consideration of at least the pleadings, and may additionally call for a ruling by the factfinder on the reasonableness of the alleged constitutional infringement. *Hobson v. Wilson, supra* note 71, 237 U.S.App.D.C. at 244, 737 F.2d at 25. In cases involving claims of unconstitutional motivation on the part of the governmental official, the doctrine of qualified immunity may impose a special burden upon the complainant at the pleading stage. See note 71 *supra.* But once that pleading burden is satisfied—as here we conclude it is—the defense·of qualified immuni-

the outset," [160] and the dismissal of the complaint was correct.[161] In order to decide whether Miller's activities fall within the narrow ambit of absolute immunity, we must carefully consider the caselaw and the policies underlying the immunity doctrine. It is this task to which we now attend.

### —The Scope of Absolute Immunity

In *Imbler v. Pachtman,*[162] the Supreme Court ruled that a state prosecutor was absolutely immune from liability for constitutional violations allegedly arising from his initiation and maintenance of a criminal prosecution.[163] Such conduct, the Court reasoned, was functionally equivalent to the acts of a judge in a criminal proceeding [164]—acts which had earlier been held to merit absolute protection under Section 1983.[165] The Court concluded that the policies underpinning the extension of complete immunity to judges and prosecutors at common law also necessitated absolute protection from constitutional claims asserted against prosecutors acting in a quasi-judicial capacity. A substantial threat of vexatious litigation could hinder vigorous performance of the prosecutor's public duties, and this inhibition would have an adverse effect on the functioning of the criminal justice system.[166] Moreover, since sufficient alternative safeguards exist to defuse the threat of prosecutorial misconduct, the systemic benefit of recognizing a civil remedy against the prosecutor would be slight in comparison to the harm likely to result from the chilling of prosecutorial discretion.[167]

The Court subsequently held in *Butz v. Economou* [168] that certain activities by members of executive agencies are absolutely shielded from liability because of the functional similarities between their official duties and those of a judge or prosecutor.[169] Again the Court pointed to the likelihood that official energies would be diverted by the threat of suit,[170] and the availability of alternative mechanisms to ward off misconduct.[171] Its analysis of the officials' activities led the Court to conclude that they too warranted absolute protection.

The *Imbler* Court did not hold, however, that a prosecutor enjoys absolute immunity for all conduct within the scope of his authority. Rather, the Court determined only that complete protection from liability is

---

ty must be raised by the official on a motion for summary judgment.

**160.** *Imbler v. Pachtman,* 424 U.S. 409, 419 n. 13, 96 S.Ct. 984, 989 n. 13, 47 L.Ed.2d 128, 137 n. 13 (1976); see *Gray v. Bell,* 229 U.S.App.D.C. 176, 182, 712 F.2d 490, 496 (1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984).

**161.** As we cautioned in *Gray v. Bell, supra* note 160, it may sometimes be necessary to look beyond the complaint to determine whether absolute immunity obtains, and in such cases disposition at the Rule 12 stage may be premature. 229 U.S.App.D.C. at 182, 712 F.2d at 496 (quoting *Forsyth v. Kleindienst,* 599 F.2d 1203, 1215 (3d Cir.1979), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981)). But further examination is warranted only where the character of the wrongful act cannot be fully discerned from allegations in the complaint. Haynesworth's charges adequately identified the features of the conduct under attack, and without more enable us to ascertain whether that species of activity is absolutely protected.

**162.** *Supra* note 160.

**163.** 424 U.S. at 424–425, 96 S.Ct. at 992, 47 L.Ed.2d at 140–141.

**164.** *Id.* at 422–423 & n. 20, 95 S.Ct. at 991 & n. 20, 47 L.Ed.2d at 138–139 & n. 20.

**165.** *Pierson v. Ray,* 386 U.S. 547, 554–555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288, 294–295 (1967).

**166.** *Imbler v. Pachtman, supra* note 160, 424 U.S. at 424–427, 96 S.Ct. at 992–993, 47 L.Ed.2d at 140–141.

**167.** *Id.* at 427–430, 96 S.Ct. at 993–995, 47 L.Ed.2d at 142–143.

**168.** *Supra* note 151.

**169.** 438 U.S. at 514, 516, 517, 98 S.Ct. at 2914, 2915–2916, 57 L.Ed.2d at 921, 922.

**170.** E.g., *id.* at 515, 98 S.Ct. at 2914, 57 L.Ed.2d at 921 ("[t]he discretion which executive officials exercise with respect to the initiation of administrative proceedings might be distorted if their immunity from damages arising from that decision was less than complete") .

**171.** E.g., *id.* at 515–516, 98 S.Ct. at 2915, 57 L.Ed.2d at 922 ("[t]he defendant in an enforcement proceeding has ample opportunity to challenge the legality of the proceeding").

appropriate when the prosecutor acts in the capacity of an advocate.[172] While the Court adverted to several circuit court decisions extending only qualified immunity to prosecutors engaged in investigative activities,[173] it did not decide whether non-advocatory conduct merited lesser protection. The Court also declined to delineate the parameters of the protected realm of advocacy, holding "only that in initiating a prosecution and in presenting the State's case, the prosecutor is immune...."[174] Although the Court "recognize[d] that the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom," it did not address the "difficult questions" of demarcation that absolute immunity claims could pose.[175]

In the wake of *Imbler*, this circuit and others have resumed their practice of according only qualified immunity to prosecutors functioning in their administrative or investigative capacities,[176] and thus frequently have been forced to confront more squarely the "difficult questions" left open by the Supreme Court. As we have heretofore noted, "[d]elineation of the precise scope of protected advocatory conduct beyond the boundaries established in *mbler* has proved to be exceedingly difficult,"[177] and divergent approaches to the problem have been employed in the circuits.[178] But at bottom these decisions turn upon the same concerns that guided the Supreme Court in *Imbler* and *Butz:* the centrality of the challenged conduct to the criminal justice system;[179] the substantiality of the threat of vexatious litigation, and the extent to which that threat would inhibit per-

172. *Imbler v. Pachtman, supra* note 160, 424 U.S. at 430–431, 96 S.Ct. at 995, 47 L.Ed.2d at 143–144 ("[w]e have no occasion to consider whether like or similar reasons require immunity for those aspects of the prosecutor's responsibility that casts him in the role of an administrator or investigative officer rather than that of an advocate").

173. *Id.* at 430 & n. 31, 96 S.Ct. at 995 & n. 31, 47 L.Ed.2d at 143 & n. 31 (citing *Guerro v. Mulhearn,* 498 F.2d 1249, 1256 (1st Cir.1974); *Hampton v. City of Chicago,* 484 F.2d 602, 608–609 (7th Cir.1973), *cert. denied,* 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974); *Robichaud v. Ronan,* 351 F.2d 533, 537 (9th Cir.1965)).

174. *Imbler v. Pachtman, supra* note 160, 424 U.S. at 431, 96 S.Ct. at 995, 47 L.Ed.2d at 144.

175. *Id.* at 431 n. 33, 96 S.Ct. at 995 n. 33, 47 L.Ed.2d at 144 n. 33.

176. E.g., *McSurely v. McClellan,* 225 U.S.App. D.C. 67, 77, 697 F.2d 309, 319 (1982); *Briggs v. Goodwin, supra* note 156, 186 U.S.App.D.C. at 188–189, 569 F.2d at 19–20; *Marrero v. City of Hialeah,* 625 F.2d 499, 506 (5th Cir.1980), *cert. denied,* 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981); *Jacobson v. Rose,* 592 F.2d 515, 524 (9th Cir.1978), *cert. denied,* 442 U.S. 930, 99 S.Ct. 2861, 61 L.Ed.2d 298 (1979); *Rex v. Teeples,* 753 F.2d 840, 843 (10th Cir.), *cert. denied,* — U.S. ——, 106 S.Ct. 332, 88 L.Ed.2d 316 (1985).

177. *Gray v. Bell, supra* note 160, 229 U.S.App. D.C. at 185–186, 712 F.2d at 499–500.

178. See generally Note, *Supplementing the Functional Test of Prosecutorial Immunity,* 34 Stan.L. Rev. 487, 489–504 (1982) (collecting cases).

179. E.g., *McSurely v. McClellan, supra* note 176, 225 U.S.App.D.C. at 77, 697 F.2d at 319 ("a prosecutor receives absolute immunity only when he acts ... in his role as a participant in the judicial phase of the criminal process"); *Taylor v. Kavanagh,* 640 F.2d 450, 453 (2d Cir. 1981) (finding plea negotiations are absolutely protected: "[t]he plea negotiation is 'an essential component' of our system of criminal justice") (quoting *Santobello v. New York,* 404 U.S. 257, 260, 92 S.Ct. 495, 497, 30 L.Ed.2d 427, 432 (1971)); *Henzel v. Gerstein,* 608 F.2d 654, 657 (5th Cir.1979) ("[t]he actions complained of were a necessary and integral part of a prosecutor's role in the judicial system"); *Joseph v. Patterson,* 795 F.2d 549, 554–555 (6th Cir.1986) ("the critical inquiry is how closely related is the prosecutor's challenged activity to his role as an advocate intimately associated with the criminal process"). Several decisions of this circuit have attempted to gauge centrality by studying the temporal relationship between the challenged conduct and the criminal trial itself, e.g., *Briggs v. Goodwin, supra* note 156, 186 U.S.App.D.C. at 187, 569 F.2d at 18 (*Imbler* focused on "claims likely to arise from prosecutorial behavior at or immediately before trial"), and the degree to which prosecutorial attention has been riveted on a particular criminal action, *id.* at 188–189, 569 F.2d at 19–20 ("absolute immunity under *Imbler* extends only so far as necessary to protect a prosecutor's decision with respect to the initiation and conduct of particular cases"). But see *Gray v. Bell, supra* note 160, 229 U.S.App.D.C. at 189 n. 38, 712 F.2d at 503 n. 38 (remarking that the *Briggs* requirement of particularity has met with "generally unfavorable comment").

formance of important public duties; [180] and the availability of alternative mechanisms to safeguard against prosecutorial misconduct.[181] The courts have drawn rough boundaries around the class of absolutely-immunized prosecutorial activities, and have treated functions such as filing charges,[182] plea-bargaining,[183] presenting evidence,[184] and negotiating parole [185] as falling within the protected sphere, and those such as executing search warrants,[186] interrogating suspects,[187] disseminating information to the press,[188] and storing evidence [189] as meriting only qualified immunity. The Supreme Court has loosely endorsed the circuits' practice of applying the functional test of *Imbler* to distinguish absolutely-protected prosecutorial conduct from those activities accorded lesser protection.[190]

### —Prosecutorial Policymaking and Advocacy

We now must apply the somewhat nebulous doctrine of prosecutorial immunity to the facts of the present case. Our first and simplest task is to determine whether the *Imbler* Court spoke directly to the conduct at issue. If we find no explicit reference, we nonetheless must consider whether Miller's activities fall under the umbrella of advocacy advertently to the criteria developed in *Imbler* and *Butz*. Our judgment will be informed by rulings of this court and other circuits mapping out the area of absolute immunity, but we recognize that this case presents a unique species of prosecutorial conduct [191] that must be assessed on its own under the standards of *Imbler*.

Haynesworth alleged harm resulting both from promulgation of a general agenda of retaliatory prosecution and from implementation of that policy against him in a criminal proceeding. We do not hesitate to extend to Miller absolute protection from liability for the latter conduct, since *Imbler* explicitly held that initiation of a criminal prosecution is absolutely protected from a suit for damages.[192] As to the formulation of general policies on prosecution, however, we find *Imbler* provides less clear guidance

180. E.g., *Gray v. Bell, supra* note 160, 229 U.S. App.D.C. at 186, 712 F.2d at 500 ("we shall look first to whether [the conduct] was sufficiently adversarial to evoke strong resentment and thus frequent retaliatory litigation"); *Simons v. Bellinger,* 207 U.S.App.D.C. 24, 31, 643 F.2d 774, 781 (1980); *Joseph v. Patterson, supra* note 179, 795 F.2d at 554.

181. E.g., *Gray v. Bell, supra* note 160, 229 U.S. App.D.C. at 187, 712 F.2d at 501 ("we shall look to whether there were prosecutorial safeguards to minimize the necessity for civil damage suits"); *Briggs v. Goodwin, supra* note 156, 186 U.S.App.D.C. at 193, 569 F.2d at 24 ("[w]hen prosecutorial activity is properly classifiable under the 'quasi judicial' rubric, 'the circumstances typically provide alternative instruments of the judicial branch to check misconduct'") (quoting *Apton v. Wilson,* 165 U.S.App.D.C. 22, 33, 506 F.2d 83, 94 (1974)); *Joseph v. Patterson, supra* note 179, 795 F.2d at 554.

182. *Henzel v. Gerstein, supra* note 179, 608 F.2d at 657.

183. *Taylor v. Kavanagh, supra* note 179, 640 F.2d at 453; *Palermo v. Warden,* 545 F.2d 286, 297 (2d Cir.1976), *cert. denied,* 431 U.S. 911, 97 S.Ct. 2166, 53 L.Ed.2d 221 (1977).

184. *Henzel v. Gerstein, supra* note 179, 608 F.2d at 657.

185. *Hamilton v. Daley,* 777 F.2d 1207, 1213 (7th Cir.1985). But see *Henzel v. Gerstein, supra* note 179, 608 F.2d at 657 n. 4 (stating without elaboration that prosecutor's actions directing an assistant attorney general in parole negotiations would not be protected).

186. *Marrero v. City of Hialeah, supra* note 176, 625 F.2d at 505; *Jacobson v. Rose, supra* note 176, 592 F.2d at 524.

187. *Rex v. Teeples, supra* note 176, 753 F.2d at 844.

188. *Marrero v. City of Hialeah, supra* note 176, 625 F.2d at 506.

189. *McSurely v. McClellan, supra* note 176, 225 U.S.App.D.C. at 78, 697 F.2d at 320.

190. *Harlow v. Fitzgerald, supra* note 125, 457 U.S. at 811 n. 16, 102 S.Ct. at 2734 n. 16, 73 L.Ed.2d at 406 n. 16.

191. We refer here to the assertion of liability against Miller for the formulation of general prosecutorial policies. See note 199 *infra* and accompanying text. To our knowledge, this type of conduct has never been evaluated by a court confronted with an invocation of prosecutorial immunity.

192. See note 163 *supra* and accompanying text.

regarding the degree of immunity that should attach. It thus becomes necessary to compare Miller's behavior with the activities in question in *Imbler* and to summon the policies that led to the grant of absolute immunity therein.

First, we find Miller's conduct to be functionally analogous to the activities immunized absolutely in *Imbler*. In that case, the Court noted the systemic importance of the decision to initiate the prosecution;[193] we find no meaningful distinction between a decision on prosecution in a single instance and decisions on prosecution formulated as policies for general application.[194] Both practices involve a balancing of myriad factors, including culpability, prosecutorial resources, and public interests;[195] both procedures culminate in initiation of criminal proceedings against particular defendants, and in each it is the individual prosecution that begets the asserted deprivation of constitutional rights.[196] The decision to focus prosecutorial energies upon particular classes of law violations or violators clearly bears many features in common with a decision to commence a single proceeding. We find in this resemblance ample reason to invoke the broad protections of *Imbler* herein.

Analysis of Miller's conduct with reference to *Imbler's* underlying principles leads to the same result. There is no doubt that, were we to decline to insulate prosecutorial policymaking, an abundance of vexatious litigation would result. As we observed in *Gray v. Bell*,[197] "[t]he prosecutor is far more likely to be the target of vindictive hostility once he has initiated criminal proceedings."[198] Since general prosecutorial policies culminate in the initiation of particular criminal actions, those policies raise the same spectre of invidious lawsuits as individual decisions to inaugurate single prosecutions. Indeed, the threat to the policymaker may be amplified; he or she, as policymaker, faces the risk of recrimination

---

**193.** *Imbler v. Pachtman, supra* note 160, 424 U.S. at 424–425, 96 S.Ct. at 992, 47 L.Ed.2d at 140–141.

**194.** Our decision in *Dellums v. Powell,* 212 U.S. App.D.C. 403, 660 F.2d 802 (1981), is instructive. The plaintiffs charged unconstitutional conduct on the part of an Attorney General of the United States in connection with the commencement of criminal proceedings against them. They attempted to distinguish *Imbler* by stressing that the Attorney General did not play a direct role in the proceedings; rather, liability was asserted on the ground that the Attorney General conspired with others to incite the prosecution. *Id.* at 407–408 n. 13, 660 F.2d at 806–807 n. 13. We disposed of the conspiracy charge succinctly:

This distinction makes no difference to the determination of immunity. So long as the Attorney General is initiating or instituting a prosecution, he is absolutely immune. Indeed, by the issuance of general instructions the Attorney General may be causally responsible for the initiation of prosecutions against members of various groups, such as mobsters, white collar criminals, or labor union officials believed to be corrupt. Such instructions can issue from conversations with subordinate officials of the Justice Department. These conversations could, within the theory advanced by the plaintiffs in this case, be characterized as constituting a "conspiracy" to initiate a malicious prosecution. To subject an Attorney General to suits of this kind would surely offend the principles of *Imbler v. Pachtman.*

*Id.;* cf. *Hamilton v. Daley, supra* note 185, 777 F.2d at 1213 n. 5 ("[s]ince absolute immunity protects prosecutorial decisions, supervision of the prosecutors who make these decisions is similarly immune").

**195.** We recognize that a decision to institute prosecutions against classes of offenders may not entail an analysis of evidentiary matter, and that it was the evidentiary feature that led some courts to analogize prosecutorial decisions to press charges to decisional activities of judges and grand jurors, and thus to affix absolute immunity. See cases cited in *Imbler v. Pachtman, supra* note 160, 424 U.S. at 423 n. 20, 96 S.Ct. at 991 n. 20, 47 L.Ed.2d at 139 n. 20. But while the *Imbler* Court took note of these decisions, *id.,* it clearly did not limit absolute protection to prosecutorial judgments involving evaluations of evidence.

**196.** See *Dellums v. Powell, supra* note 194, 212 U.S.App.D.C. at 407, 660 F.2d at 806 ("[n]ever has a prosecutorial official been held liable for causing a prosecution to be brought"); see also *Taylor v. Kavanagh, supra* note 179, 640 F.2d at 453 ("there can be no monetary liability for injuries related solely to the prosecution itself") (citing *Lee v. Willins,* 617 F.2d 320, 322 (2d Cir.), *cert. denied,* 449 U.S. 861, 101 S.Ct. 165, 66 L.Ed.2d 78 (1980)).

**197.** *Supra* note 160.

**198.** 229 U.S.App.D.C. at 186, 712 F.2d at 500.

from the potentially larger number of parties prosecuted in accordance with the agency directive. The threat of litigation is very real, and indubitably would inhibit the performance of prosecutorial duties.[199]

Additionally, there are alternative safeguards sufficient to check official misconduct in the formulation of prosecutorial policies. Those policies will frequently result in criminal proceedings,[200] and therein the defendants will be accorded the full panoply of trial and appellate mechanisms to attack suspect practices.[201] Furthermore, prosecutors are subject to professional discipline, public censure, and perhaps even criminal penalties for unsavory acts;[202] and to the extent that policy decisions have wider impact than conduct in individual prosecutions, they are more likely to produce a backlash. "The rationale underlying absolute immunity does not re-

quire perfect *substitutes* for the remedy of civil damages;"[203] rather, it demands no more than that available mechanisms adequately reduce the likelihood of misconduct. We think that test is satisfied herein.

We are mindful that our determination that Miller is absolutely immune may leave a "genuinely wronged defendant without civil redress,"[204] but we realize, as the Court did in *Imbler*, that "'the answer must be found in a balance between the evils inevitable in either alternative.'"[205] Were we to extend only qualified immunity to promulgation of standards of prosecution, we would deter the formulation of policy,[206] thereby jeopardizing individual defendants and the criminal justice system as a whole. Given the means currently available to deter misconduct in this area, we view the additional protection afforded

---

**199.** The dynamics of the situation suggest that prosecutors will not only be timid about formulating policy, but also that they may forego policymaking altogether. If supervisory officials understand that they could invite litigation by their attempts to cabin prosecutorial zeal through the issuance of policy statements, they might well opt to leave individual prosecutors without clear guidance or control. Discouraging the centralization of prosecutorial decision-making is plainly unwise. It would seem beyond peradventure that arbitrary or discriminatory prosecutions are far less likely to occur when prosecutorial decisions are disseminated office-wide by policies promulgated by accountable officials. For example, a presidential task force has emphasized the importance of general standards that "pertain to such matters as ... the kinds of offenses that should be most vigorously prosecuted in view of the community's law enforcement needs." President's Commission on Law Enforcement and the Administration of Justice, The Challenge of Crime in a Free Society 133 (1967). The same concerns have motivated both the American Bar Association and the Department of Justice to develop standards to ensure that prosecutorial judgments are made "at an appropriate level of responsibility." United States Department of Justice, Principles of Federal Prosecution, pt. A3(a) (1980); see Model Code of Professional Responsibility—Prosecution and Defense Functions 3–2.5(a) (1980) ("[e]ach prosecutor's office should develop a statement of ... general policies to guide exercise of prosecutorial discretion"). These important efforts would be seriously undermined if prosecutorial policymaking commanded no more than qualified immunity.

**200.** The charges against Haynesworth were dismissed before trial, but one episode should not control a determination implicating an entire species of prosecutorial conduct. Moreover, to deny absolute immunity simply because the official conduct was never challenged in court would discourage prosecutors from dismissing meritless actions before trial, since only by pursuing the sham charges would the prosecutor be fully immune.

**201.** See, e.g., *Gray v. Bell, supra* note 160, 229 U.S.App.D.C. at 187 & n. 32, 712 F.2d at 501 & n. 32 ("after the decision to seek an indictment there is generally close and direct judicial scrutiny of prosecutorial conduct") (citing *Apton v. Wilson, supra* note 181, 165 U.S.App.D.C. at 33, 506 F.2d at 94).

**202.** See *Imbler v. Pachtman, supra* note 160, 424 U.S. at 429, 96 S.Ct. at 994, 47 L.Ed.2d at 142–143. We think courts and bar disciplinary committees would have complete authority to proceed against a policymaker for unconstitutional conduct even if he or she does not participate in the individual prosecutions.

**203.** *Gray v. Bell, supra* note 160, 229 U.S.App.D.C. at 187 n. 35, 712 F.2d at 501 n. 35 (emphasis in original).

**204.** *Imbler v. Pachtman, supra* note 160, 424 U.S. at 427, 96 S.Ct. at 993, 47 L.Ed.2d at 142.

**205.** *Id.* at 428, 96 S.Ct. at 994, 47 L.Ed.2d at 142 (quoting *Gregoire v. Biddle, supra* note 158, 177 F.2d at 581).

**206.** See note 199 *supra.*

by the civil remedy for damages as insufficient justification to tie the prosecutor's hands in this regard. We thus affirm the District Court's ruling that absolute immunity attaches to Miller's policymaking activities, and we find that Haynesworth's complaint against him was properly dismissed.

#### 4. *The District of Columbia*

Haynesworth alleged that the District of Columbia is responsible for its employees' acts of retaliatory prosecution. He invoked the doctrine of respondeat superior as a basis for vicarious liability,[207] and further contended that the District is directly responsible because the practice of retaliatory prosecution was sufficiently prevalent to constitute official policy.[208] The District Court rejected both theories, finding that respondeat superior did not apply to municipalities and that retaliatory prosecution was not sufficiently promoted by the District to support liability.[209] We conclude that the court was correct in its disposition of the respondeat superior claim, but in error in its ruling on direct accountability.

 The District Court was on firm ground in discarding Haynesworth's respondeat-superior theory of liability. Although we had decided in *Dellums v. Pow-*

*ell*[210] that the District of Columbia could be deemed vicariously accountable in a *Bivens*-type action,[211] the District Court accurately discerned[212] that our holding in *Dellums* had been seriously undermined by the Supreme Court in *Monell v. Department of Social Services.*[213] *Monell* specifically rejected respondeat superior as a basis for municipal liability, in consequence of its analysis of the legislative history underlying Section 1983.[214] That decision, thus predicated, did not necessarily preclude derivative liability in *Bivens*-type actions,[215] but since the District Court considered the question we have flatly decided that a *Bivens* action against a municipality cannot be grounded on respondeat superior.[216]

#### (a) *Municipal Liability for Unconstitutional Conduct*

Although the law was once to the contrary,[217] *Monell* firmly established that a municipality can be held directly liable in damages for constitutional violations.[218] That liability attaches under Section 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [constitutional] injury...."[219] Al-

---

**207.** Complaint, *supra* note 1, ¶ 38, A.App. 19.

**208.** *Id.* ¶ 37, A.App. 19.

**209.** *Memorandum Opinion, supra* note 60, at 7, A.App. 54.

**210.** *Supra* note 94.

**211.** 184 U.S.App.D.C. at 328–333, 566 F.2d at 220–225.

**212.** *Memorandum Opinion, supra* note 60, at 6–7, A.App. 53–54.

**213.** 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

**214.** 436 U.S. at 690–694, 98 S.Ct. at 2035–2038, 56 L.Ed.2d at 635–638. *Monell* also concluded that municipalities could be held directly liable for harms occasioned by unconstitutional official policies. See notes 217–219 *infra* and accompanying text.

**215.** See note 1 *supra*.

**216.** *Tarpley v. Greene, supra* note 1, 221 U.S. App.D.C. at 237, 684 F.2d at 11; see also *Miller v. Barry*, 225 U.S.App.D.C. 407, 408, 698 F.2d 1259, 1260 (1983) (per curiam); *Boykin v. District of Columbia*, 223 U.S.App.D.C. 80, 87, 689 F.2d 1092, 1099 (1982).

**217.** In *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), the Supreme Court held that municipalities could not be sued under § 1983 for damages for constitutional violations. *Id.* at 187, 81 S.Ct. at 484, 5 L.Ed.2d at 505. The Court expressly overruled that holding in *Monell v. Department of Social Servs.*, *supra* note 213, 436 U.S. at 701, 98 S.Ct. at 2041, 56 L.Ed.2d at 641–642.

**218.** *Monell v. Department of Social Servs., supra* note 213.

**219.** *Id.* at 694, 98 S.Ct. at 2037–2038, 56 L.Ed.2d at 638. The Supreme Court has employed this analysis in numerous cases decided after *Monell*. E.g., *Pembaur v. City of Cincinnati*, 475 U.S. 469, ——, 106 S.Ct. 1292, 1297, 89 L.Ed.2d 452, 461 (1986); *City of Oklahoma City v. Tuttle*,

though Section 1983 is unavailable in this case,[220] this form of responsibility seems clearly imposable in a constitutionally-implied action as well.[221]

 The municipal liability of which we now speak is direct, not vicarious. It is premised, not on the mere fact that the wrongdoing officer is municipally employed, but on the existence of some policy fairly attributable to the municipal government itself. The primary justification for this type of liability is the recognition that a municipality can act only through those who enable it to function.[222] When an officer or employee has been delegated power or responsiblity to act *for* the municipality in a given area, he may be acting *as* a unit of the municipal government, thus rendering the municipal entity liable for his constitutional wrongdoings.[223] The critical issue, then, is whether the municipal representative, when engaging in the activity challenged, can properly be said to have acted as the alter ego of the municipality. This inquiry poses a question of fact rather than law,[224] and in order to survive a motion to dismiss, the complaint must set forth a "plausible nexus" between the action assailed and the authority conferred by the municipality.[225]

 The question whether policymaking by a municipal officer should be deemed a municipal act for liability purposes turns on the scope and nature of the officer's authority.[226] If the official possesses final authority to promulgate policy in the relevant sphere, his decisions "constitute the municipality's final decisions" and hence provide a basis for municipal accountability.[227] The clearest case is presented when final say over the chal-

---

471 U.S. 808, 821, 105 S.Ct. 2427, 2435, 85 L.Ed.2d 791, 803 (1985) (plurality opinion); see also *Carter v. District of Columbia, supra* note 115, 254 U.S.App.D.C. at 77, 795 F.2d at 122; *Miller v. Barry, supra* note 216, 225 U.S.App.D.C. at 408–409, 698 F.2d at 1260–1261.

**220.** See note 1 *supra.*

**221.** See note 1 *supra.* This court has ruled that the precepts of *Monell* apply in *Bivens* actions to bar imposition of respondeat-superior liability on municipalities. *Tarpley v. Green, supra* note 1, 221 U.S.App.D.C. at 236, 684 F.2d at 10. Thus, *Monell's* reasoning should also apply in *Bivens* suits to find direct municipal liability for unconstitutional municipal policies.

**222.** *Van Ooteghem v. Gray,* 628 F.2d 488, 494 (5th Cir.1980), *vacated in part,* 654 F.2d 304 (5th Cir. *en banc* 1981), *cert. denied,* 455 U.S. 909, 102 S.Ct. 1255, 71 L.Ed.2d 447 (1982); *Stoddard v. School Dist. No. 1,* 590 F.2d 829, 835 (10th Cir.1979); Schnapper, *Civil Rights Litigation After Monell,* 79 Colum.L.Rev. 213, 217 (1979).

**223.** *Malak v. Associated Physicians, Inc.,* 784 F.2d 277, 283 (7th Cir.1986).

**224.** *Estate of Bailey v. County of York,* 768 F.2d 503, 506 (3rd Cir.1985) (citing *Owen v. City of Independence,* 445 U.S. 622 at 633–634 & n. 13, 655 n. 39, 100 S.Ct. at 1406–1407 & n. 13, 1417 n. 39, 63 L.Ed.2d 673 at 682–683 & n. 13, 696 n. 39 (1980)); *Berdin v. Duggan,* 701 F.2d 909, 914 (11th Cir.), *cert. denied,* 464 U.S. 893, 104 S.Ct. 239, 78 L.Ed.2d 230 (1983).

**225.** *Estate of Bailey v. County of York, supra* note 224, 768 F.2d at 506–507.

**226.** *Brewer v. Blackwell,* 692 F.2d 387, 401 (5th Cir.1982); *Malak v. Associated Physicians, Inc., supra* note 223, 784 F.2d at 283.

**227.** *Rookard v. Health & Hosps. Corp.,* 710 F.2d 41, 45 (2d Cir.1983); see also *Familias Unidas v. Briscoe,* 619 F.2d 391, 404 (5th Cir.1980) (actions of a state judge holding "absolute sway" over certain decisions can be attributed to the municipality under § 1983); *Williams v. City of Valdosta,* 689 F.2d 964, 969 (11th Cir.1982). For the purpose of affixing liability on a municipality, it is irrelevant that the decisionmaker enjoys personal immunity for the behavior under attack. The Supreme Court, in *Owen v. City of Independence, supra* note 224, ruled that a municipality could not escape liability under § 1983 by invoking the good-faith immunity of its officers. 445 U.S. at 651–654, 100 S.Ct. at 1415–1417, 63 L.Ed.2d at 693–695. In fact, the personal immunity accorded to city officials militates in favor of municipal liability, since a contrary ruling would leave victims of unconstitutional conduct without any remedy, *id.* at 651, 100 S.Ct. at 1413, 63 L.Ed.2d at 693, and city officials without incentive to abide by the Constitution, *id.* at 652, 100 S.Ct. at 1416, 63 L.Ed.2d at 694. See also *Bennett v. City of Slidell,* 728 F.2d 762, 766 (5th Cir.), *petition for reh'g denied,* 735 F.2d 861 (5th Cir.1984) (per curiam). The municipality may also face § 1983 liability for the conduct of officials who enjoy absolute personal immunity. E.g., *Familias Unidas v. Briscoe, supra* (municipality may be held liable for conduct of a judge). We believe the same principles apply to render the good faith or absolute immunity of involved officials irrelevant to the determination of municipal liability under *Bivens.*

lenged edict reposes in the decisionmaker by law or official pronouncement.[228] But an individual further down the municipal chain of command may as a practical matter possess final authority to exercise judgment in a particular area, and in such cases it may be feasible to attribute his actions to the municipality for liability purposes.[229] Possession by a lower-level official of de facto final authority may be evidenced by the failure of supervisory personnel to oversee his decisions,[230] or by a tendency of subordinate employees to acquiesce in his directives.[231] These directives may be embodied in formal rules established through official lawmaking procedures, but they may also be promulgated through more informal channels.[232]

### (b) *Sufficiency of the Allegations Against the District of Columbia*

 The District Court, in dismissing Haynesworth's claim against the District of Columbia, stated that he had failed to show that the activities complained of had been authorized by policymaking officials.[233] The court adverted to the existence of the policy directive prohibiting retaliatory prosecution, as well as to the ultimate dismissal of the charges against Haynesworth by supervisory officials, in an effort to support its conclusion that the practice of retaliatory prosecution was unauthorized.[234] . While we agree that those factors were relevant in determining whether municipal liability should attach,

---

**228.** E.g., *Rookard v. Health & Hosps. Corp., supra* note 227, 710 F.2d at 45–46; *Familias Unidas v. Briscoe, supra* note 227, 619 F.2d at 404; *Schnapper, supra* note 222, at 217–219.

**229.** See *Rookard v. Health & Hosps. Corp., supra* note 227, 710 F.2d at 45 ("[a]n official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions"); *Berdin v. Duggan, supra* note 224, 701 F.2d at 914; *Bowen v. Watkins,* 669 F.2d 979, 989–990 (5th Cir.1982). *Schnapper, supra* note 222, notes that *Monell* itself involved an exercise of implied authority since the individual charged with formulating and enforcing the policy in issue had been delegated decisionmaking authority through informal departmental practice. 79 Colum.L.Rev. at 220 (citing *Monell v. Department of Social Servs., supra* note 213)).

**230.** *Bowen v. Watkins, supra* note 229, 669 F.2d at 989–990 ("[i]f a higher level official has the power to overrule a decision but as a practical matter never does so, the decisionmaker may represent the effective final authority on the question"); see also *Berdin v. Duggan, supra* note 224, 701 F.2d at 914 n. 17.

**231.** *Berdin v. Duggan, supra* note 224, 701 F.2d at 914 (upholding a finding of municipal liability where "all it took was the mayor to say 'Get your stuff and go ...' [and] that is what happened"); *Schnapper, supra* note 222, at 223 ("[i]f a government employee establishes a rule which is to be and is in fact obeyed by other government employees, the rule should ordinarily be deemed to be within the policymaking authority of the first employee").

**232.** *Pembaur v. City of Cincinnatti, supra* note 218, 475 U.S. at ——, 106 S.Ct. at 1299, 89 L.Ed.2d at 461–462 (noting that "official policy" usually refers to rules of general application

"often but not always committed to writing"). Rules of general application, however promulgated, must be distinguished from official decisions specifically tailored and limited to a particular incident, e.g., *id.* (challenging a policymaking officer's participation in a search of petitioner's premises), and from situations in which official acquiescence, rather than affirmative conduct on the part of the decisionmaker, underpins the asserted municipal liability, e.g., *Carter v. District of Columbia, supra* note 115, 254 U.S.App.D.C. at 77–78, 795 F.2d at 122–123 (evaluating whether failure of police supervisory personnel to train or discipline their officers with regard to arrest procedures amounted to tacit approval of those procedures and provided a basis for municipal liability). In each of the latter situations, the scope of municipal liability is uncertain. See, e.g., *City of Springfield v. Kibbe,* —— U.S. ——, 107 S.Ct. 1114, 94 L.Ed.2d 293 (1987) (writ of certiorari to consider municipal liability for negligent supervision held to have been improvidently granted); *id.* at ——, 107 S.Ct. at 1116–1119 (dissenting opinion) (Court should have reached merits and determined that municipalities could not be held liable for negligent failure to supervise); *Pembaur v. City of Cincinnatti, supra* note 218, 475 U.S. at ——, ——, ——, 106 S.Ct. at 1294, 1302, 1304, 89 L.Ed.2d at 457, 466, 467 (court divided on scope of municipal liability for single acts of policymaking officers). While the existence of an unwritten policy of general application may be more difficult to prove than a formal edict promulgated through official channels, once established it provides a basis for fastening liability on the municipality.

**233.** *Memorandum Opinion, supra* note 60, at 7 n. 4, A.App. 54.

**234.** *Id.,* A.App. 54.

we deem them insufficient to defeat the claim against the District at the outset of this litigation.

 Viewed in the light most favorable to Haynesworth,[235] we believe that his complaint presented sufficient information to proceed against the District for the retaliatory prosecution asserted. Haynesworth alleged that Miller was responsible for establishment and implementation of policies for the Law Enforcement Section of the Corporation Counsel's Office.[236] The complaint also charged that Miller pursued a policy of retaliatory prosecution,[237] as did other District attorneys acting under his direction.[238] These allegations, if proven, could supply an adequate foundation for attribution of Miller's conduct to the District.

 At any trial of this issue, the District may attempt to show that Miller's decisions were routinely monitored by his superiors, and that showing could serve to insulate the municipality from liability. Evidence that the charges against Haynesworth were dropped when he lodged an administrative complaint would be relevant in this regard, but the bare allegation of that fact does not preclude municipal liability for the prosecution. Nor does the mere existence of a policy directive condemning retaliatory prosecutions defeat Haynesworth's claim against the District. If the District can establish that the directive was vigorously enforced, it may be that Miller acted without municipal authority. Absent such a showing, if Haynesworth can establish that the Corporation Council's office actually adhered to a policy of retaliatory prosecution, the directive will be rendered meaningless.[239]

 As noted, the question of municipal responsibility for unconstitutional official actions is one of fact so long as the plaintiff sets forth a "plausible" basis for the assertion of liability.[240] We find that Haynesworth's complaint sets forth adequate ground for attributing the challenged conduct to the District, and that he is entitled to an opportunity to prove the District's legal responsibility for harm caused by the retaliatory prosecution.[241]

## IV. CONCLUSION

Our conclusions in this multifaceted appeal reduce to the following. Dismissal of Hancock's complaint is not properly before us, and the District Court is encouraged to reconsider its original order when the litigation resumes upon issuance of the mandate on this appeal. Gildon must be reinstated as a defendant because the District Court erroneously granted her motion for judgment on the pleadings. Haynesworth is unable to maintain a cause of action against either of the former Chiefs of Police on a respondeat-superior theory, and has not stated a claim of direct responsibility against Jefferson, but is entitled to proceed against Cullinane for his alleged failure adequately to train and supervise his subordinates. Miller enjoys absolute immunity for his actions as the prosecutor in Haynesworth's case and for his conduct as policymaker in the Corporation Counsel's office. Miller's alleged wrongdoing nevertheless provides a basis for proceeding against the District of Columbia since it appears that he may have possessed sufficient policymaking authority to act for the District in the establishment of prosecution

---

**235.** See note 11 *supra.*

**236.** Complaint, *supra* note 1, ¶ 4, A.App. 10.

**237.** *Id.* ¶ 34, A.App. 18.

**238.** *Id.* ¶ 17, A.App. 14.

**239.** If we were to conclude otherwise, the District could escape future liability under *Bivens* or § 1983 simply by enacting general prohibitions against unconstitutional acts without providing for their enforcement. Schnapper, *supra* note 222, at 231.

**240.** See note 225 *supra.*

**241.** Haynesworth also seeks recovery of punitive damages against the District. Complaint, *supra* note 1, at 16 (prayer for relief), A.App. 23. The Supreme Court has ruled that punitive damages may not be assessed against a municipality pursuant to § 1983. *Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616, 634–635 (1981). We think that such an award is likewise inappropriate in a *Bivens* suit.

policies. The District Court's action is accordingly affirmed in part and reversed in part, and the case is remanded to that court for proceedings consistent with this opinion.

*So ordered.*

VAN PELT, Senior District Judge, concurring:

I desire to make a short statement as to my concurrence. I commend Judge Robinson on his opinion, in which Judge Wright has concurred, and his attempt to bring order to plaintiff's argument which is disorganized, verbose, and difficult to follow.

When this case was argued and submitted to the panel, Hancock's claim had been dismissed as improperly joined. The claims of Haynesworth were standing as against Schwartz, Lyddane and Mooney, the officers who had arrested him. As to Hancock's claim, I disagree with Judge Robinson's opinion in part only; I conclude that it was reversible error to dismiss his claim. I think it should have been severed. *See:* Rule 21, Federal Rules of Civil Procedure, and Footnote 1, page 7, of Brief of Appellees. He should have full protection against statutes of limitations. The dismissal of Sonya Proctor, the police officer, who arrested Hancock, can be reconsidered if Hancock's claim is reinstated.

I concur in the affirmance of Miller's dismissal. While this comment may not be relevant at this stage of the proceedings, I comment gratuitously that Howard B. Horowitz is immune to the same extent that Miller is immune, assuming his acts were taken within the scope of his advocacy duties.

I concur in rejecting the respondeat superior claims against Cullinane and Jefferson and in the dismissal of Jefferson on the basis that there was insufficient personal involvement on his part to implicate him in either the formulation of the alleged policy or its execution. I agree that further discovery should be allowed on Haynesworth's claim against Cullinane. Cullinane, in turn, should be given the right to develop the affirmative defense of qualified immunity. It is possible that he could present this defense in a motion for summary judgment. Thus, I also would reverse the dismissal of Cullinane for these purposes. The trial court may or may not conclude that the defense of qualified immunity can be presented in a motion for summary judgment or that a jury issue exists as to this officer.

As to the issue of liability of the District of Columbia, I recognize my tendency as a judge from outside the District to defer to Judges Robinson and Wright and their general knowledge of the intention and history of the District of Columbia governmental action. I agree that liability cannot be based on the theory of respondeat superior. As to the possibility of direct liability based upon proof of the existence of a municipal policy or course of action, I would hold that *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), is applicable based on the status of this case at the time of the ruling of the district judge. Nevertheless, I concur in the action proposed, since this case should have immediate attention. Later review by a full panel of the court is always a possibility, with an issue such as the applicability of *Monell.*